# Exhibit 5

1     UNITED STATES BANKRUPTCY COURT

2       DISTRICT OF OREGON

3 In re:       )
           )
4 Mary Anne Michiko Roberts, ) Case No. 15-63116-tmr7
           )
5 Debtor;      )
           )
6 Kathleen Arthur,   ) Case No. 15-62393-tmr7
           )
7 Debtor;      )
           )
8 Cheryl Kae Stites,  ) Case No. 14-35071-rld7
           )
9 Debtor.      )
 _____)
10 United States Trustee,  ) Adversary Nos:
           )
11 Plaintiff,    ) 16-3031-rld
           ) 16-6061-rld
12 v.        ) 16-6062-rld
           )
13 Vincent Howard,    )
 Howard Law, P.C.,   )
14 Erik Graeff,    )
 Law Offices of Erik Graeff, )
15 P.C.,       )
           )
16 Defendants.    )
 _____)

17

18      30(b)(6) DEPOSITION OF

19       VINCENT HOWARD

20     SANTA ANA, CALIFORNIA

       SEPTEMBER 8, 2016
21

22 ATKINSON-BAKER, INC.
 COURT REPORTERS
23 (800) 288-3376
 www.depo.com
24
 REPORTED BY: ANDREA L. ROSS, CSR NO. 7896
25
 FILE NO: AA08EEF

                 1

1               UNITED STATES BANKRUPTCY COURT

2                  DISTRICT OF OREGON

3  In re:                    )
                            )

4  Mary Anne Michiko Roberts,  )  Case No.  15-63116-tmr7
                            )

5  Debtor;                 )
                            )

6  Kathleen Arthur,        )  Case No.  15-62393-tmr7
                            )

7  Debtor;                 )
                            )

8  Cheryl Kae Stites,      )  Case No.  14-35071-rld7
                            )

9  Debtor.                 )
  _____)

10  United States Trustee,    )  Adversary Nos:
                            )

11  Plaintiff,           )  16-3031-rld
                            )  16-6061-rld

12  v.                    )  16-6062-rld
                            )

13  Vincent Howard,        )
  Howard Law, P.C.,       )

14  Erik Graeff,           )
  Law Offices of Erik Graeff,  )

15  P.C.,                 )
                            )

16  Defendants.          )
  _____)

17

18      Deposition of VINCENT HOWARD, taken on behalf of

19  Plaintiff United States Trustee, at the Ronald Reagan

20  Federal Building and U.S. Courthouse, 411 West Fourth

21  Street, Suite 7160, Santa Ana, California, commencing at

22  10:00 a.m., Thursday, SEPTEMBER 8, 2016, before ANDREA L.

23  ROSS, CSR No. 7896.

24

25

                                            2

```
 1                A P P E A R A N C E S:

 2

        FOR PLAINTIFF UNITED STATES TRUSTEE:
 3
        U.S. DEPARTMENT OF JUSTICE
 4      OFFICE OF THE UNITED STATES TRUSTEE
        BY:  CARLA G. McCLURG, ESQ.
 5      620 SW Main Street
        Room 213
 6      Portland, Oregon  97205
        (503) 326-7659
 7      carla.mcclurg@usdoj.gov

 8

        FOR DEFENDANT VINCENT HOWARD:
 9
        KESHER LAW GROUP, P.C.
10      BY:  JEFFREY KATZ, ESQ.
        1919 North Heliotrope Drive
11      Santa Ana, California  92706
        (714) 296-8309
12      jeffrey.katz@kesherlawgroup.com

13

        FOR DEFENDANT ERIK GRAEFF:
14
        THE SCOTT LAW GROUP
15      BY:  LOREN S. SCOTT, ESQ.
        2350 Oakmont Way
16      Suite 106
        Eugene, Oregon  97401
17      (541) 868-8005
        lscott@scott-law-group.com
18      (Appearance via telephone)

19

20

21

22

23

24

25
```

3

1    injury, and Social Security disability.

2        Q    Any other areas?

3        A    No, ma'am.

4        Q    Did you previously practice other areas of law?

5        A    Yes, ma'am.

6        Q    What areas were those?

7        A    Oh, gosh, criminal defense, immigration, we

8    represented a lot of medical marijuana clinics at one

9    time when that was first taking off here, mass tort

10   litigation, debt settlement, bankruptcy.  That's all I

11   can think of right now off the top of my head.

12       Q    When did you --

13       A    Oh, wrongful foreclosure, I'm sorry.

14       Q    Okay.  When did you discontinue the debt

15   settlement component of your practice?

16       A    Recently here within the last year, year and a

17   half.

18       Q    Do you have a more sort of precise frame of time

19   in which you wound it down?

20       A    Well, when Judge Staton issued her order against

21   Morgan Drexen.

22       Q    Do you know approximately when that was?

23       A    Within the last year, year and a half, something

24   like that.

25       Q    And then did you discontinue your bankruptcy

14

1   practice at about the same time?

2       A    If not then, maybe shortly before then.

3       Q    And what was --

4       A    It might have been all around the same time.

5       Q    What steps did you take to wind down the debt

6   settlement and bankruptcy component of your practice?

7       A    Oh, well, that was difficult because after the

8   judge entered her order, Judge Staton in the Morgan

9   Drexen matter, we had to get rid of all of our clients.

10  So we had to do the best -- it was hard, difficult,

11  because we didn't have all our files because, as I

12  mentioned previously, last time we met, your office has

13  them.

14          And though they were ordered to give them back,

15  we never got them.  So we're trying to operate off the

16  best files that we had and we know we sent letters out to

17  clients letting them know they had to find counsel

18  elsewhere.  And that was a long process trying to contact

19  the clients and have them do that.

20      Q    So maybe it would be helpful if we sort of laid

21  a foundation for the records issue as far as

22  understanding that component of what you're talking

23  about; okay?

24      A    Uh-huh.

25      Q    As I understand it, your law firm used Morgan

30(b)(6): Vincent Howard
September 8, 2016

```
 1    contact with him.  It was usually Glass Ratner, the group
 2    that they hired to come in.
 3        Q    And as far as who actually has some records,
 4    would that be Mr. Golden or Glass Ratner?
 5        A    Probably.  I don't know.
 6        Q    I just wanted to be clear for the record, so
 7    when you refer to my office, aside from what I've
 8    collected in connection with this matter, I just want to
 9    be clear.  I don't -- I'm not in charge of -- we're not
10    in charge of Morgan Drexen's bankruptcy as the trustee if
11    that makes sense.
12        A    Yes, ma'am.
13        Q    Does that make sense?
14        A    Uh-huh.
15        Q    So you were starting to describe a little bit of
16    the process that you undertook to contact clients
17    approximately a year ago after Judge Staton issued an
18    order; is that correct?
19        A    Yes, ma'am.
20        Q    Do you remember what was the substance of the
21    order, because frankly I'm not -- I haven't been
22    following that that closely and so I don't quite know all
23    of the different orders that have been entered.  So can
24    you explain to me what order that is you're referring to.
25        A    Yes.  There was an original order against Morgan
```

17

1    Drexen to not collect any more money from the affected

2    consumers and that they could no longer do anything with

3    those clients.  It only mentioned Morgan Drexen.

4         And then there was an issue with the files.

5    Morgan Drexen provided support for like I think it was 50

6    or 60 law firms at that time and so they had files for

7    all these law firms' clients.  We needed our files so

8    that we can see where we were with the cases and we

9    asked -- I think Golden was the trustee at this time --

10   we asked for the files, but out of abundance of

11   caution -- I don't know what happened with John Houston,

12   but something happened with him and the bankruptcy judge

13   that led them to believe that they need to ask for

14   permission to do anything further with the files after

15   that.

16        So they told us to get permission from the court

17   and they would give us the files.  When we requested

18   permission, that's when the judge said even though you're

19   not mentioned, you're a part of the injunction too.  And

20   I don't know if it was that order or a subsequent order,

21   but she said we could eventually have our files back.

22        We tried to work that out with Golden's office.

23   Several of the attorneys who use Morgan Drexen from

24   around the country were trying to work that out.  It's my

25   understanding some of them paid -- they issued a price

18

30(b)(6): Vincent Howard
September 8, 2016

1    that we were supposed to pay to get the files.  Some of

2    the attorneys paid it.  Some didn't.  But ultimately no

3    one received their files back from the trustee's office,

4    so the files were all operating from incomplete and we --

5    all the law firms had to take it upon themselves to hire

6    someone to parse it out if they were going to do that or

7    just try and just operate from that point forward.  Law

8    firms did different things.

9            We tried to operate from what we had and it was

10   difficult to try and get letters out to clients letting

11   them know or calling them and letting them know that we

12   could no longer represent them and that they would have

13   to find alternative counsel.

14       Q    So one thing that would be helpful to me is to

15   understand the law firms in which you have had a

16   management or equity interest since you've been

17   practicing law because I've seen a couple law firms and I

18   just want to make sure I understand all of them.  So can

19   we start with the first law firm in which you had like a

20   management or equity position after you obtained your

21   license.

22       A    Okay.  It was Howard Nassiri, LLP.

23       Q    So if I remember correctly, so you and was it

24   Damian Nassiri?

25       A    Yes, ma'am.

19

1     A    Probably wherever Lawrence is because though

2  he's licensed in Kansas, he's living in Florida.

3     Q    And what part of Florida was he in?

4     A    I don't know at that time.  Now he's in Orlando.

5     Q    As far as other physical office locations, what

6  other physical office locations can you think of now?

7     A    I don't know.  I would have to go back and see

8  where we were incorporated or registered with the state

9  bar.  The states require you to register a physical

10  office location somewhere.

11     Q    Would Williamson and Howard, LLP, be registered

12  in each place that its partners were located?

13     A    Not all the time, not necessarily, no.

14     Q    And why not?

15     A    I don't know.

16     Q    Did Williamson and Howard, LLP, have any

17  partners located in Oregon?

18     A    I don't know.  I can't recall at this time.

19     Q    So as far as, like, the location of the

20  partnership agreements, if you were to go look for them,

21  where would you go look for them?

22     A    Now?  I don't know.  Probably look on some old

23  hard drives or something to see if I could find them.

24     Q    Do you maintain the old hard drives?

25     A    Some of them, yes.

30(b)(6): Vincent Howard
September 8, 2016

1          Q    How many approximately do you have?

2          A    Oh, I don't know, one, two, because some of

3     these things were on the main servers that were taken so

4     some of the stuff is on there.

5          Q    Okay.  But I'm trying to figure out what do you

6     have.  That's what I'm asking you.  So you have one or

7     two hard drives?

8          A    Yes.

9          Q    What's on them?

10         A    What's on what?

11         Q    Your hard drives.

12         A    Stuff for work.

13         Q    What stuff is on the hard drives that may

14    pertain to Howard Law, PC, or to Williamson and Howard,

15    LLP?

16         A    Oh, research, maybe some client files,

17    contracts, vendor information, advertising materials,

18    stuff that a law firm would have on their hard drive.

19         Q    So you think that the partnership agreements

20    might be on there for Williamson and Howard, LLP?

21         A    They may.  I don't know.

22         Q    Do you have a particular software program that

23    you need to be able to use to be able to access that

24    information?

25         A    Just log in.

30

1      Q    When is the last time that you accessed the

2 information on these hard drives that you've described?

3      A    Two days ago.

4      Q    What was the purpose of your accessing

5 information at that time?

6      A    I think I was looking for a motion.

7      Q    Approximately how many client files do you

8 believe are located on the hard drives?

9      A    What kind of client files, for debt?

10     Q    Let's stick with debt settlement or bankruptcy.

11 Approximately how many --

12     A    None, zero.

13     Q    What about you mentioned cars.  What kinds of

14 contracts were you referring to?

15     A    My contract with Westlaw, with Lexis, I don't

16 know, whatever vendors we have contracts with.

17     Q    Any other kinds of contracts that you can think

18 of that would be on there?

19     A    Our building lease.

20     Q    What kinds of advertising material do you

21 maintain on there?  Do you maintain certain kinds --

22     A    Like my --

23     Q    -- of things?

24     A    -- Martindale Hubbell profile, my Avvo profile,

25 there's some pictures on there from past photo shoots.

31

```
 1        A    Not a particular time, no.  We are always
 2   constantly making sure they're correct.
 3        Q    How did Howard Law and Williamson and Howard pay
 4   Morgan Drexen for its services?
 5        A    We'd be invoiced and then we'd pay the invoice.
 6        Q    Was the invoice paid by check?
 7        A    I don't know, probably, or transfer.  I don't
 8   know.
 9        Q    Did you review each invoice before it was paid?
10        A    Not each invoice, but I did random sampling of
11   them to make sure.
12        Q    Who was responsible then for reviewing and
13   paying the invoices if it wasn't one that you had
14   sampled?
15        A    We'd get an invoice and we'd just pay it.
16        Q    Who was responsible for the payment?  Would that
17   be Miss Ketsdever or Miss Acosta?  Who was responsible
18   for that?
19        A    Well, if it was Williamson and Howard, it would
20   be Loretta.
21        Q    And then as far as, like, all of these invoices
22   for the services that were provided for by Morgan Drexen,
23   do you still have those records?
24        A    No.
25        Q    Wouldn't you have needed them to prepare the
```

49

30(b)(6): Vincent Howard
September 8, 2016

1   firm's tax returns?

2       A    I don't know.  I don't prepare my own tax

3   returns.  I don't think I need the invoices.  I don't

4   know.  Maybe I do.

5       Q    Do you have the general ledger from Williamson

6   and Howard and Howard Law, PC?

7       A    No.

8       Q    Where is --

9       A    Not that I recall.

10      Q    Where is the general ledger?

11      A    I don't know.

12      Q    When is the last time that Williamson and Howard

13  filed a tax return?

14      A    I don't know.  I'd have to check.

15      Q    Is it on extension?

16      A    It doesn't exist anymore.

17      Q    I understand.  But I mean we are in August so

18  either a tax return was filed in 2016 for 2015, right, or

19  it would be on extension or you would know if it was

20  delinquent; right?  So I'm just trying to figure out

21  where Williamson and Howard is at in that process.

22      A    I'm telling you I don't know.

23      Q    What about Howard Law, do you know where that is

24  at in that process, when the last tax return was filed?

25      A    I think we just filed our tax return.

50

1    Q    Was that for 2015?

2    A    Yes, I think so.

3    Q    Where did the information come from to prepare

4    that tax return?

5    A    Oh, I don't know.  I don't know.

6    Q    Who compiled the information for preparing the

7    tax return?

8    A    My office manager would usually do that and put

9    that together --

10   Q    Okay, would --

11   A    -- or hire an outside service to do it and they

12   get it together.  I don't know.

13   Q    Was that Diane Davies?  Is that --

14   A    Davis it was at one time, yeah.

15   Q    When was the last time she worked for you?

16   A    Last year.

17   Q    Approximately when did she leave?

18   A    Probably June or July last year.

19   Q    So who was responsible for maintaining the

20   general ledger for Howard Law, PC?

21   A    What is the general ledger?

22   Q    It is the accounting records for Howard Law, PC.

23   It is what you would use to generate your tax returns.

24   A    I don't know.  I think it's Snell Wilmer or

25   something like that.  I don't know.

51

30(b)(6): Vincent Howard
September 8, 2016

Case 16-03013-rld   Doc 48-1   Filed 11/04/16   UST Exhibit 5 - Page 14 of 41

1       Q   Okay.  So who did you just pay to do the tax

2  returns for Howard Law?

3       A   That's who we paid.  I think it's Snell Wilmer,

4  something like that.

5       Q   And where are they located?

6       A   I don't know.  I think they're here in

7  California somewhere.

8       Q   And who bundled up the information to Snell

9  Wilmer to get them what they needed for the tax return?

10      A   Oh, I don't know.  I can't recall.  They send

11  over a list of things and we get it -- I get it or I look

12  for it and get it to them.

13      Q   So was it you?

14      A   It may have been me.  I don't know.  It depends

15  on what they asked for.

16      Q   I would imagine that they would want your

17  bookkeeping records; correct?

18      A   I don't know.

19      Q   If they didn't check with you about the

20  bookkeeping records for Howard Law, who would they check

21  with?

22      A   I don't know.  Me.

23      Q   Okay.  So what did you provide them to prepare

24  your tax return?  If you were the main point of contact,

25  what did you give them?

52

1      A    I know you don't like my answers, but I don't

2   know.   I told you they e-mail me something, they tell me

3   what to send, and I send it to them.   What that is, I

4   don't know.   I can't recall at this time.

5      Q    But you signed a tax return for 2015 for Howard

6   Law; is that correct?

7      A    Yes.

8      Q    Did that tax return include deductions for

9   business expenses?

10     A    I don't know.

11     Q    Did Howard Law have a large tax bill that it's

12  responsible for from that tax return?

13     MR. KATZ:   That's ambiguous.

14     THE WITNESS:   Not that I recall.

15  BY MS. McCLURG:

16     Q    I'm just asking if there was a large amount that

17  was owed for taxes.

18     A    Not that I recall.

19     Q    So if I were to try to figure out what

20  information you provided to the accounting firm to

21  prepare the 2015 taxes, would you have all that

22  information in your e-mail in a folder somewhere?

23     A    I don't know.

24     Q    Was Howard Law, PC, current on its 2012, 2013,

25  and 2014 tax returns?

53

30(b)(6): Vincent Howard
September 8, 2016

```
 1        A    I don't know.
 2        Q    Where was the general ledger maintained for
 3   Williamson and Howard?
 4        A    I can't recall.
 5        Q    Did you maintain any trust accounts in the name
 6   of Williamson and Howard?
 7        A    Williamson and Howard had trust accounts, yes.
 8        Q    And where do the records live pertaining to
 9   those trust accounts?
10        A    I can't recall at this time.
11        Q    What did you do as the attorney to wind down
12   those trust accounts?
13        A    I can't recall at this time.
14        Q    What is your understanding as your obligation as
15   a licensed attorney to supervise and manage your trust
16   accounts?
17        A    I don't know, whatever the Model Rule for
18   California says.  I don't know what it is at this time.
19        Q    Well, tell me what you do.  What do you do to
20   fulfill that obligation?
21        A    I check the accounts.
22        Q    How often?
23        A    Periodically.
24        Q    What do you describe as periodically?
25        A    I don't know.
```

57

30(b)(6): Vincent Howard
September 8, 2016

1    Q    How did you check the accounts?

2    A    Online.

3    Q    And what records did you compare them against to

4    make sure that they were accurate?

5    A    Whatever records I had at the time.

6    Q    What are those records?

7    A    I can't recall at this time.

8    Q    Where did you go to find those records?

9    A    Online.

10    Q    Where online?

11    A    The bank.

12    Q    Okay.  So you have the bank statement; correct?

13    A    Uh-huh.

14    Q    But that alone would not tell you all the

15    information that you needed; right?

16    A    I don't know.

17    Q    So you don't recall in looking at the trust

18    account information on the bank Web site what you would

19    look at to compare it against to make sure it was

20    accurate; is that right?

21    A    Not at this time, correct.

22    Q    What would help jog your memory as to the

23    process you undertook to do that?

24    A    I don't know.

25    Q    So tell me about your relationship with various

58

30(b)(6): Vincent Howard
September 8, 2016

1    do you call them -- consults that they would have with

2    the clients, maybe sometimes it was relayed in a letter.

3    I don't know.  That depends on the attorney.

4         Q    But tell me about these log notes.  What are

5    those?

6         A    Notes that the attorney would keep with their

7    clients.

8         Q    Who could access the log notes and how?

9         A    The attorney would access it with their log-in.

10        Q    Where?

11        A    On the software that was proprietary to Morgan

12   Drexen.

13        Q    And so if I were to look at the log notes for a

14   case, what is it that I would see?

15        A    You see the attorney and anything that they put

16   in there along with any staff, any notes that they put in

17   there.

18        Q    When you say staff, do you mean the Morgan

19   Drexen support staff?

20        A    Or the staff, yeah, the Morgan Drexen support

21   staff that the attorney may have hired or their own

22   personal staff.  Anyone can put in log notes in there.

23        Q    Where are the log notes for client files right

24   now?

25        A    The U.S. Trustee's Office has those.

88

1    Q    No, they're not.

2    A    Well, that's as far as I know.  You're asking

3    me, not you, so that's my answer.

4    Q    We don't maintain Morgan Drexen's records just

5    to be clear.

6    A    You took them.  I don't know where they're at.

7    I've asked for them back, you won't give them, so I don't

8    know.

9    Q    Are you --

10   A    Ask Mr. Smith, the guy you talked about earlier.

11   You know he has some records because you've been in

12   contact with him.

13   Q    What about Mr. Reed.

14   A    Mister who?

15   Q    Mr. Reed, R-e-e-d, do you remember Mr. Reed?

16   A    No.

17   Q    Wasn't he like a local counsel that worked with

18   Howard Law?

19   A    I don't know.

20   Q    You don't know Timothy Reed?

21   A    Oh, Timothy Reed, oh, well, yeah, but you just

22   said Reed.  I don't know.  Timothy Reed.

23   Q    So you remember Timothy Reed; correct?

24   A    Yes.

25   Q    So are you aware that Timothy Reed provided a

89

30(b)(6): Vincent Howard
September 8, 2016

1    voluminous set of log notes in response to a court order

2    to show cause down here in the Central District of

3    California?

4        A    I don't know.  Did he?

5        Q    Yes, he did.

6        A    So why is this important to me?

7        Q    I'm trying to figure out how, if you know,

8    Mr. Reed was able to provide those log notes and you were

9    not.

10        A    Well, I don't have access to them.  Why don't

11    you ask Mr. Reed where he got them.  I don't know.

12        Q    So you do not have access to any log notes?

13        A    No.

14        Q    Are you aware that Mr. Katz represents Mr. Reed?

15        A    I guess so, yeah.  Does he?  He has his own law

16    firm.  He's doing his own thing.  I don't have to know

17    everything about his business.

18        Q    Okay.  Well, I'd like to ask you some more

19    questions about Exhibit 31 while it's in front of you

20    starting with page two, paragraph seven --

21        A    Hold on, hold on.

22        Q    "In my capacity as the president of Howard Law,

23    I am responsible for overseeing the maintenance,

24    organization, and preservation of Howard Law's books and

25    records.  Such books and records are maintained in the

90

```
 1    ordinary course of business in an organized and
 2    businesslike manner."
 3              Was that correct?
 4        A    Yes.
 5        Q    So when you said that the books and records were
 6    maintained in the ordinary course of business in an
 7    organized and businesslike manner, what did you mean?
 8        A    Well, this is talking about these client files
 9    on that software I was telling you about, the proprietary
10    software that I don't have access to that your office
11    has --
12        Q    Right.
13        A    -- and it was demanded by the court to give back
14    to us but they didn't.
15        Q    Okay.  Well, I'm trying to understand why you
16    indicated that you were responsible for overseeing the
17    records and that they are maintained in the present tense
18    on a document that was filed in September 2015 after the
19    timing of the order that you previously described that
20    the district court entered in this matter.
21        A    Yeah.
22        Q    So did you have access to records then in
23    September of 2015?
24        A    Maybe.
25        Q    What happened after that then?
```

91

30(b)(6): Vincent Howard
September 8, 2016

1       A    I don't know.

2       Q    What about can you turn to the next page, page

3  three, paragraph 14.  "In my capacity as the holder of a

4  partnership interest in W & H" -- and if you look

5  previously above that in paragraph 11, it says

6  "Williamson and Howard, LLP"?

7       A    Uh-huh.

8       Q    "I am responsible for overseeing the

9  maintenance, organization, and preservation of W & H's

10  books and records.  Such books and records are maintained

11  in the ordinary course of business in an organized and

12  businesslike manner."

13            Was that correct?

14       A    Uh-huh.

15       Q    Is that yes?

16       A    Yes.

17       Q    I'm trying to understand that paragraph in light

18  of your testimony earlier today when I was asking you

19  about records for Williamson and Howard.  Can you explain

20  your testimony earlier today regarding, you know, your

21  lack of knowledge regarding the books and records of

22  Williamson and Howard compared to the language in

23  paragraph 14 of Exhibit 31?

24       MR. KATZ:  Objection, argumentative.

25       THE WITNESS:  It sure is because I said I don't

92

1    recall and I don't know.  Just because I said here in a

2    declaration where I was sitting and writing it doesn't

3    mean my answer is going to magically change now.  I don't

4    recall at this time.  I don't know.

5    BY MS. McCLURG:

6         Q    So where are the records of Williamson and

7    Howard?

8         A    I don't know.

9         Q    When is the last time you had access to the

10   records of Williamson and Howard?

11        A    I can't recall.

12        Q    Did you have access to the records in September

13   of 2015?

14        A    I would imagine.  I don't know.

15        Q    Did something happen after September of 2015 to

16   the records?

17        A    I don't know.

18        Q    So was this statement true and correct at the

19   time that you wrote this?

20        A    It was.

21        Q    Is it still true and correct?

22        A    I guess it is.

23        Q    So you do have books and records then?

24        A    I said I don't recall.

25        Q    Well, how -- how is that -- can -- how can you

93

30(b)(6): Vincent Howard
September 8, 2016

1    1099 forms, invoices, receipts, canceled checks, check

2    stubs, and notes."

3         The response has a number of objections in the

4    first paragraph, and the second paragraph indicates

5    "Subject to and without waiving the foregoing objections,

6    Howard will produce relevant, non-privileged documents

7    that are responsive to this request on a rolling basis as

8    they become available as they pertain to the legal

9    services provided to debtor.  However, Graeff and/or

10   Graeff Law made no payments to Howard in connection to or

11   relating to debtor."

12        So our request was broader than the Stites

13   bankruptcy case.  My question to you is do you have

14   records that are responsive to request for production

15   number one?

16        A    I don't know.  I can't recall at this time.  My

17   attorney helped me prepare this I think, need to file a

18   different request for production if it's broader or you

19   have a different interpretation of it.  I don't know.  At

20   this time as I sit here, I don't know.

21        Q    But the rules actually require you to let me

22   know if there are responsive documents so that I don't

23   have to file a motion unnecessarily asking you to produce

24   what you do not have.  So what I'm trying to get at today

25   is whether or not you have these records because I don't

30(b)(6): Vincent Howard
September 8, 2016

1  want to have to file a motion that is, you know, not

2  going to be necessary if you don't actually have the

3  records that we're seeking.

4       So what I'm trying to ascertain is whether or

5  not you in fact have these records and so we can go by

6  them one by one and, you know, but I'm just trying to

7  explain to you the reason why I'm going through these is

8  because in your response you're actually required to tell

9  me whether or not you do have responsive records.  So as

10  to request for production number one, you've indicated

11  that you don't recall; is that correct?

12      A  Well, what I'm saying is this:  My answer is

13  going to be the same for all of them.  We can go through

14  all of them or not.  It's my understanding we've produced

15  everything that we have thus far.

16      Q  Well, there --

17      A  Is there something that we didn't produce that

18  you're looking for?

19      Q  So what I'm trying to clarify is we've requested

20  records that are broader than Ms. Stites' case because --

21      A  Let me stop you there.  Did we not produce them?

22      Q  I got, like, 60 pages of records and that was

23  it.  That's what I got.

24      A  Okay.

25      Q  And because of the objections that seem to limit

128

30(b)(6): Vincent Howard
September 8, 2016

1    your response to Miss Stites' case, I want to understand

2    what it is that you might have so that I can ascertain

3    whether or not it makes sense for us to ask that you

4    produce them.

5         A    I don't know.  This seems like it's something

6    that's the subject of a meet and confer letter as opposed

7    to asking me right now to talk about what documents I may

8    or may not have based on an expansion of your discovery

9    request sitting here at this deposition.  I don't know.

10   I don't know.  That's a meet and confer type thing.

11        MR. KATZ:  I think she's entitled to know if you

12   know whether or not you have the documents so she can

13   decide how to proceed.  So if you know, you should tell

14   her so she can make a decision what to do.

15        THE WITNESS:  That's why I said, as I sit here now,

16   no, I'm not hiding anything.  It's my understanding you

17   have everything that I have.  Is that the answer?

18        MR. KATZ:  No, no, no; your response limited it to

19   just Stites.  She's saying that her request went beyond

20   Stites so she wants to know if you have information or

21   documents that are responsive beyond Stites.

22        THE WITNESS:  Like what?

23        MR. KATZ:  Well --

24   BY MS. McCLURG:

25        Q    I mean if you wouldn't mind reading the request.

30(b)(6): Vincent Howard
September 8, 2016

1      A    I don't know.   What did we produce?   I don't

2  know what you produced.   I don't know.   I don't know as I

3  sit here.   I'd have to look to see what we produced.   I

4  don't remember what was produced.   And then you're asking

5  me to remember what I produced and see if that's

6  sufficient enough.   I don't know.   But, look, if you --

7  I'm not telling you to do a motion to compel.

8      If you want, I don't know, reproduce this and

9  have me look again.   I don't know.   As I sit here right

10  now, I just don't know.   And I'm really not trying to be

11  difficult.   I just don't know.   And maybe I don't

12  understand the question.   I don't know.   But I thought we

13  produced everything we have.   I don't know.   It's hard

14  for me to say without looking at the discovery.

15      If you need something else, just let me know and

16  we can do it.   You don't have to file a motion to compel,

17  just let me know.   I don't know as I sit here.

18      Q    Do you have accounting records?

19      A    I can look and see.   I can ask David.   Just let

20  me know.   I'll do that for you.   I'm really not trying to

21  be difficult.   I'm serious.   I will.   I just don't know

22  right now.

23      Q    Mr. Walker no longer works for you; right?

24      A    No.

25      Q    So he doesn't actually have the records; right?

130

1    A    He --

2    MR. KATZ:  He didn't say he would ask him for, he

3 was asking whether or not there were records.

4 BY MS. McCLURG:

5    Q    And whether or not they existed in the past.

6 What I'm trying to figure out is if they exist now.

7    A    Well, I don't know.  Maybe he knows.  I don't

8 know.  I don't know.  All I can do is ask.

9    Q    He left earlier this year; right?

10    A    Yes.

11    Q    So for your law firm, where do all the

12 accounting records currently reside?

13    A    Well, my accounting records are on my server.  I

14 don't know if anything with Erik Graeff is on my server

15 right now.

16    Q    Could you go to your server and figure that out?

17    A    Well, yes.

18    Q    So you might have things that would be

19 responsive?

20    A    I might; I might not.  I don't know.  I told you

21 I don't know as I sit here.  I don't know.

22    Q    But you have Howard Law's accounting records on

23 your server?

24    A    Yes.  I don't know if we have everything related

25 to this time period, but accounting as it relates to my

131

1    cases now, yes.

2        Q    What about bank statements, have you maintained

3    those as a regular part of your practice?

4        A    You're talking about with regards to this stuff,

5    the debt settlement stuff, bankruptcy stuff?

6        Q    Well, I guess the accounts that you would have

7    run it through.

8        A    We may have some of that, some of it we don't.

9    Like I said, when the systems got seized, I don't have

10   access to that stuff and the trustee's office made it

11   very difficult in us getting it back.  We still don't

12   have it back to this day so I don't know.  Maybe there's

13   something on there.  I don't know.  You have the ability

14   to subpoena them and get it.  I just don't know.

15       Q    Is there a person that you work with at that tax

16   accountant that you mentioned --

17       A    Snell and Wilmer?

18       Q    Snell and Wilmer, is there a particular person

19   there?

20       A    No.

21       Q    And you're the person that worked with the

22   accounting firm to prepare the tax records?

23       A    Yes.

24       Q    Do you have like a bookkeeper or office

25   assistant or somebody that currently helps you?

132

1       A   No, unfortunately not.  It's piecemeal.  I try

2   to do what I can.  I'm looking.

3       Q   Okay.  Well, we're going to have to kind of

4   going on through these.  Maybe we will luck out and there

5   will be one that will be one that you will hopefully have

6   some records for.  So request for production number two

7   on page four, "Produce all documents regarding payments

8   from you to Graeff or Graeff Law for the period of

9   January 1, 2012, through January 1, 2016," and then it

10  says "including without limitation" and a number of

11  documents.  Do you have any of those records?

12      A   Other than what we produced, no, not that I know

13  of.

14      Q   Request for production number three, "Produce

15  all documents regarding payments from you to Oregon

16  attorneys associated with you and/or Morgan Drexen other

17  than payments described in request number two above for

18  the period of January 1, 2012, through January 1, 2016."

19  And then it goes on to describe the kinds of records.

20          Now, this is broader than just Mr. Graeff and it

21  includes other Oregon attorneys.  Do you have records

22  pertaining to payments that were made to other Oregon

23  attorneys?

24      A   Other than what we produced?  I don't know.  I

25  would assume we produced everything or are we --

30(b)(6): Vincent Howard
September 8, 2016

1    Q   I received nothing.

2    A   I don't know.  I can't recall at this time.  I

3  don't know.  Have you done a meet and confer with my

4  attorneys to see if they can get you what you need?

5    Q   Well, it's generally my experience it's more

6  productive for me to just ask you during a deposition or

7  an examination what you have.

8    MR. KATZ:  How is that going?

9    THE WITNESS:  Yes, that's not working with me and

10  I'm not doing it to be mean, but I just don't know.  So

11  much stuff has gone on in the last year.  You know what

12  I've been going through; right?  It's a lot.  I was even

13  depressed for a period of time.

14  BY MS. McCLURG:

15    Q   I'm sorry to hear that?

16    A   I know.  I'm generally such a happy person.

17    Q   Okay.  So I would like to talk to you next about

18  request for production number six on page six.  This one

19  asks for documentation of payments to you from clients

20  who resided in Oregon and then it goes on to describe the

21  same period of time, January 1, 2012, through January 1,

22  2016.  Do you have any records that would match that

23  request?

24    A   Not that I recall, no, other than what we've

25  produced.

134

1          Q    So from what I understand from your other

2     testimony, do you believe that Morgan Drexen may be in

3     possession of records that would satisfy that request and

4     the other ones that we've talked about?

5          A    Yes, ma'am, either them or on those servers,

6     yes, ma'am.

7          Q    And do you know how it is that that information

8     could be pulled up or compiled like were there any

9     management reports that you ran to sort of call in

10    information for Oregon attorneys and clients?

11         A    In the past if I wanted something like that, I

12    could request that and Avi could do it but he quit.  And

13    then later when we tried to hire him to help us retrieve

14    some of that data, the court didn't want him doing it for

15    us so there's no way.  I don't know.  I don't know.

16         Q    So on page eight, I have to talk to you about

17    request for production number 10, "Produce all written

18    communications between you and Graeff and/or Graeff Law

19    for the period of January 1, 2012, through January 1,

20    2016."  Do you have those documents?

21         A    Other than what I've produced, as I sit here

22    now, I don't recall having anything else.

23         Q    What about e-mails?

24         A    Yeah, I don't have anything else.

25         Q    Did you --

30(b)(6): Vincent Howard
September 8, 2016

```
 1        A    Other than what I produced.
 2        Q    Did you search through your e-mails in response
 3   to this request for production?
 4        A    It's my understanding, yes.
 5        Q    Did you direct someone to search through your
 6   e-mail for you?
 7        A    Yes.
 8        Q    Who did you direct to do that?
 9        A    Jake, the IT guy.
10        Q    I thought he was -- is he employed by you still
11   or did you just hire him back?
12        A    No, just hire him back for that project because
13   there was issues.  When the server was taken, some of our
14   stuff was lost.  We tried to save what we could.  We're
15   on a new server now and we can't retrieve all of the
16   e-mails that we would have historically had but for the
17   seizing of that information and if they were to give it
18   back, maybe we could pay someone to do it, but the check
19   that I did, I gave you everything that I have.  I don't
20   have anything else to my understanding.
21        Q    Can you turn to page five, request number 11,
22   "Produce all documents" --
23        MR. KATZ:  Page nine?
24        THE WITNESS:  Did you say nine or five?
25   ///
```

136

30(b)(6): Vincent Howard
September 8, 2016

1    BY MS. McCLURG:

2         Q    Oh, yes, I'm getting my numbers mixed up now.

3    Exhibit 5, page nine, request number 11.

4         A    Okay.

5                        (Exhibit 5 marked.)

6    BY MS. McCLURG:

7         Q    "Produce all documentation regarding the

8    termination of your relationship with Graeff and/or

9    Graeff Law, including without limitation, e-mails, notes,

10   correspondence, agreements, lists, accountings, and

11   statements."

12             Do you have any of that kind of documentation?

13        A    Other than what I've produced, not that I can

14   recall right now.

15        Q    What happened once Mr. Graeff terminated his

16   relationship with you?

17        MR. KATZ:    Ambiguous.

18   BY MS. McCLURG:

19        Q    So Mr. Graeff terminated his relationship with

20   you early last year; correct?

21        A    I don't know.    Maybe.

22        Q    So --

23        A    If you say he did, okay.

24        Q    Do you recall when Mr. Graeff terminated his

25   relationship with you?

137

1  about that.  I don't know.  I don't know.

2       Q    Did you maintain documents regarding this

3  transition?

4       A    What kind of documents?  For transition?

5       Q    Yes.

6       A    What kind of documents?

7       Q    Well, some of the ones that we've talked about

8  like communications to clients or statements,

9  documentation regarding transfers of trust account

10 balances, did you maintain those kinds of documents?

11      A    I would suppose so, yes.

12      Q    Do you still have those?

13      A    Other than what we've produced, I think I've

14 given you everything I have.

15      Q    Can you turn to Exhibit 5, page 12, request for

16 production number 17, "Produce all documents provided by

17 Morgan Drexen to you pertaining to the accounting

18 services rendered by Morgan Drexen to you for Oregon

19 clients for the period of January 1, 2012, through

20 January 1, 2016," and then it goes on to describe the

21 kinds of records.

22           Do you have any of those kinds of documents in

23 your own possession or do they all reside with Morgan

24 Drexen?

25      A    I'm going to say those probably reside with

30(b)(6): Vincent Howard
September 8, 2016

1    Morgan Drexen because as I look at this list, I don't

2    have that information other than what I've produced if I

3    produced anything.  I can't recall what I produced at

4    this time.

5         Q    Handing you Exhibit 6.

6                        (Exhibit 6 marked.)

7    BY MS. McCLURG:

8         Q    This is a list of clients that was provided to

9    me by Mr. Berman who represented you previously in

10   connection with your Rule 2004 Examination, and that

11   happened in September of 2015, so I would like to

12   understand where the information came from to compile

13   this list on Exhibit 6.

14        A    I do not know.

15        Q    Do you know who provided the information to

16   Mr. Berman?

17        A    No.

18        Q    Did it come from your firm's records?

19        A    I don't know.  I really don't know.

20        Q    Do you know what happened to these clients that

21   are listed as Mr. Graeff's clients?  Are these the ones

22   that were transitioned to you?

23        A    I don't know what this list is.

24        Q    Handing you Exhibit 7.

25                        (Exhibit 7 marked.)

142

```
1    BY MS. McCLURG:
2        Q    Exhibit 7 is another list that was provided to
3    me in the last examination.  This one lists client file
4    numbers for your firm.  Do you know who compiled this
5    list?
6        A    This from the 2004 examination as well?
7        Q    It is.
8        A    I can't recall at this time.
9        Q    Are any of these clients still active clients of
10   yours?
11       A    No.
12       Q    If they had money in a trust account at the time
13   that you terminated the relationship with them, what
14   happened to that money?
15       A    Oh, the judge made us give it back.
16       Q    And how did you figure out how much money there
17   was?
18       A    In their trust account?
19       Q    Yes.
20       A    Just look online I guess and see.  The
21   accounting department handled that.  We did hire David to
22   help us with that.
23       Q    So you have online access to the trust accounts?
24       A    I don't know.  Whatever David used to do it, I
25   don't know.  We hired David to do it.  I don't know how
```

143

1   he did it.  He took care of it.

2       Q    Can you access your trust accounts online?

3       A    Probably.

4       Q    So the request for production that asked for

5   information that pertained to bank account records, would

6   you then have access to those records online?

7       A    I don't know.

8       Q    What kinds of information can you see when you

9   log onto the bank?

10      A    Your account balance.  I don't know.

11      Q    Could you get images of canceled checks when you

12  go on there?

13      A    No.

14      Q    Do you know what kind of banking package that

15  you have?

16      A    No.

17      Q    I'm handing you Exhibit 9.

18               (Exhibit 9 marked.)

19  BY MS. McCLURG:

20      Q    Exhibit 9 is a statement and this is for formal

21  resolution services and it's with Mr. Graeff.  You'll see

22  on page two, remember we talked about $1,155.12 before?

23  It says "Credit:  Trn Fnd In, $1,155.12" on page 2,

24  11-19-12.  Was that the transfer of money from your trust

25  account to his trust account?

144

1    transfers happened consistent with the statement?

2         A    I don't even know what you're talking about.

3         Q    Can you tell me about this Bank of America NYC

4    account that's listed on Exhibit 10?

5         A    Who gave you this?

6         Q    It says "MD," Morgan Drexen.

7         A    I don't know.  This is -- not only did Morgan

8    Drexen give it to you, this is Erik Graeff's account.

9         Q    Correct, but the account that is depositing

10   money into his account was Bank of America.  November --

11        A    I don't know.

12        Q    -- 13 --

13        A    I don't know.

14        Q    Do you have an account at Bank of America or did

15   you at one time?

16        A    Apparently if that's what it says.

17        Q    And why was money being wired from the account?

18   Was that the practice as to how funds were transferred or

19   was that an anomaly?

20        A    I don't know.  You can ask David.  He can answer

21   all your banking questions.

22        Q    Do you have access to that Bank of America

23   account?

24        A    I don't know.  I don't think now.

25        Q    Do you have any records for that Bank of America

146

1    account?

2        A    Not that I recall.

3        Q    Handing you exhibit 11.

4                    (Exhibit 11 marked.)

5    BY MS. McCLURG:

6        Q    This is a collection of documents that pertain

7    to the settlement with Chase for Miss Stites.  I wanted

8    to walk through them with you in order.  So if I look at

9    page one, there is a settlement that is listed to Chase,

10   and it looks like there's a settlement fee 4-28-11

11   towards the bottom, $2,064.66.

12            Would that be a payment to your firm?

13       A    The 2,064?

14       Q    Yes.

15       A    I don't know if that represents a fee, but to

16   the extent it is a fee and if it's for debt settlement,

17   it would be to our firm.

18       Q    And so --

19       A    This is Stites; right?

20       Q    Yes.

21       A    Yes.

22       Q    Okay.

23       A    Because we did her debt settlement.

24       Q    Okay.  So the settlement starts on, so page

25   three, is that the settlement plan there?  Is that the

147

**Exhibit 6**

1  Sean A. OKeefe – State Bar No. 122417
2  **OKEEFE & ASSOCIATES**
   **LAW CORPORATION, P.C.**
3  4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
   Telephone: (949) 334-4135
5  Facsimile: (949) 274-8639
6  Email:  sokeefe@okeefelc.com `
   Counsel for Howard Law, P.C., Vincent Howard,
7  Williamson & Howard, LLP, and The Williamson
   Firm, LLC, and Lawrence Williamson
8

9

10              **UNITED STATES DISTRICT COURT**

11             **CENTRAL DISTRICT OF CALIFORNIA**

12

13  CONSUMER FINANCIAL PROTECTION      Case No. SACV13-01267 JLS (JEMx)
    BUREAU,

14              Plaintiff,

15                                     **DECLARATION OF VINCENT**
                                       **HOWARD IN SUPPORT OF**
16         v.                          **RESPONSE OF NON-PARTIES**
                                       **HOWARD LAW, P.C., VINCENT**
17                                     **HOWARD, WILLIAMSON &**
    MORGAN DREXEN, INC., AND           **HOWARD, LLP, THE**
18  WALTER J. LEDDA, INDIVIDUALLY      **WILLIAMSON LAW FIRM, LLC**
    AND AS OWNER, OFFICER, OR          **AND LAWRENCE WILLIAMSON**
19  MANAGER OF MORGAN DREXEN,          **TO ORDER TO SHOW CAUSE RE**
    INC.,                              **CONTEMPT**
20
                Defendants.
21                                     **HON. JOSEPHINE L. STATON**

22

23                                     **DATE: September 4, 2015**
                                       **TIME: 1:30 P.M.**
24                                     **PLACE: Ctrm. 10A**

25

26

27

28

# DECLARATION OF VINCENT HOWARD

I, Vincent Howard, hereby declare and state as follows:

## The Declarant

1.      I am over the age of eighteen years and I am of sound mind.

2.      The facts stated herein are within my personal knowledge.

3.      I am licensed to practice law in the State of California.

## Howard Law, P.C. and Williamson & Howard, LLP

4.      I am the president of Howard Law, P.C. ("Howard Law"), a California professional corporation, and I own all of the shares therein.

5.      Howard Law is a law firm that is in the business of providing legal services to its clients.

6.      I hold fifty percent of the Class A partnership interests in Williamson & Howard, LLP, a California limited liability partnership ("W & H").

7.      Lawrence Williamson owns the balance of the Class A partnership interests in W & H.

8.      Lawrence Williamson is licensed to practice law in the State of Kansas.

9.      W & H is a law firm that is in the business of providing legal services to its clients.

10.      I am authorized and empowered to speak for both Howard Law and W & H (together the "Howard Firms").

1

11.     In my capacity as the President of Howard Law I am responsible for overseeing the maintenance, organization and preservation of Howard Law's books and records. Such books and records are maintained in the ordinary course of business in an organized and business-like manner.

12.     In my capacity as the holder of a partnership interest in W & H, I am responsible for overseeing the maintenance, organization and preservation of W & H's books and records. Such books and records are maintained in the ordinary course of business in an organized and business-like manner.

13.     The range of legal services that Howard Law provides to its clients includes, but is not limited to legal representation in business litigation matters, personal injury matters, consumer protection and class action legal matters, social security disability matters, labor and employment matters, and insolvency and bankruptcy matters.

14.     The range of legal services that W & H provides to its clients includes, but is not limited to legal representation in business litigation matters, tax, TCPA and FDCPA matters, estate and insolvency and bankruptcy law matters.

15.     Within the context of their insolvency and bankruptcy law practices, the Howard Firms provide debt workout or "debt settlement" services for both business and consumer clients.

16.     In a typical consumer debt settlement case, an insolvent consumer laboring under the burden of debt obligations that the consumer can no longer pay will

1   approach the Howard Firms seeking partial or complete relief from this debt burden,

2   through a consensual workout or "debt settlement," or failing such a settlement,

3
4   through a bankruptcy filing under Chapter 7 or Chapter 13 of the Bankruptcy Code.

5          17.    Since most of the consumers seeking the foregoing relief are individuals

6   in financial distress, their ability to pay for legal services is very limited. As a

7
8   consequence, most law firms will not undertake the representation of such clients.

9          18.    In order to accommodate the needs of the foregoing constituency of

10  financially challenged consumer clients, while at the same time affording the Howard

11
12  Firms the means to obtain reasonable remuneration for the legal services being

13  provided, the Howard Firms' outsourced certain paralegal and administrative services.[1]

14         19.    The provider that had the most complete suite of paralegal and

15
16  administrative services was Morgan Drexen, Inc. ("Morgan Drexen"). Accordingly, the

17  Howard Firms entered into a contractual relationship with this provider. The contract

18  reflecting this arrangement is attached hereto as Exhibit "1" (the "MD Administrative
19
20  Services Contract").

21         20.    In a typical case involving a financially distressed client seeking debt

22  relief, one of the Howard Firms would enter into an attorney-client relationship with
23

24

25  _____

26  [1] Outsourcing legal administrative services is both a lawful and appropriate practice.
    See Cal. State Bar Formal Opn. No. 2012-184; see also American Bar Association
27  (ABA) Formal Opn. No. 08-451.

28

the client. This relationship would be documented in a standard written retainer agreement.[2] A true and correct copy of this standard form of retainer agreement is attached hereto as Exhibit "2."

21.     Once the foregoing attorney client relationship was entered into, Morgan Drexen would then provide the designated clients of the Howard Firms the suite of outsourced clerical, paralegal and accounting services described in the MD Administrative Services Contract.

22.     Pursuant to the MD Administrative Services Contract, Morgan Drexen's paralegal personnel were tasked with contacting the creditors holding debt related claims against the consumer client, and attempting to solicit a debt settlement plan wherein the creditor would consent to reduce its debt to an agreed upon level, and the client-debtor would then agree to pay this reduced sum over time.

23.     The attorneys at the Howard Firms would review and approve the proposed debt settlement plan if it was in the best interest of the client, and they would also intervene in the negotiation process, when necessary, to try to facilitate an agreement with an intransigent creditor. Many times, the attorneys themselves will personally initiate negotiations.

---

[2] Under California law, an attorney-client relationship is created by contract, either express or implied. Neel v. Magana, Olney, Levy, Cathcart & Gelfand, 6 Cal.3d 176, 181 (1971); Houston General Insurance Co. v. Superior Court, 108 Cal.App.3d 958, 964 (1980); Miller v. Metzinger, 91 Cal.App.3d 31, 39-40 (1979).

24. Once such a debt settlement plan was agreed upon and documented, the consumer was then required to maintain the funds necessary to pay the negotiated settlement (as approved by the client) in the trust account maintained by either Howard Law or W & H, as the case may be (depending upon which firm had the client relationship). The applicable firm would then periodically draw from this fund the sum needed to make the payment owed to the creditor under the agreed upon debt settlement plan and to pay the firm its legal fee for rendering this service.

25. In many instances, consumer clients employ one of the Howard Firms to prepare a bankruptcy petition concurrently with the rendering of debt settlement services. This agreed upon course of action is implemented for a number of sound reasons including the following: In many instances a creditor will refuse to discount its debt, or the consumer's financial hardship will become so acute during the negotiation process that the filing of a petition under Chapter 7 of the Bankruptcy Code is necessary in order to discharge the debt that is burdening the consumer.

26. When the Howard Firms entered into the MD Administrative Services Contract with Morgan Drexen, they fully expected the Morgan Drexen's paralegals to prepare the bankruptcy petitions as agreed, and they believed that this work was being done or had been done. When this Court ruled that Morgan Drexen had not prepared the petitions as contractually agreed—the petitions that their clients paid for—they were shocked, and took steps to address these failures.

27.     The Howard Firms never "shared" fees with Morgan Drexen. They were invoiced monthly for services that Morgan Drexen represented were in fact rendered.

28.     The Howard Firms are still in the process of determining whether or not Morgan Drexen charged other fees for work that was not completed. This review process has been delayed and materially impaired by the Howard Firms' inability, until of late, to obtain copies of their client files from the bankruptcy estate.

29.     In addition to the foregoing services, under the terms of the MD Administrative Services Contract, Morgan Drexen agreed to maintain the Howard Firms' client files. Such files contain a range of information about the clients' financial and legal circumstances, and some instances they include communications, directions and notes that are subject to the attorney-client and/or work product privileges. Due to these circumstances, Morgan Drexen was required to maintain these client files in the strictest confidence and to promptly return the same to the Howard Firms if the relationship with Morgan Drexen was terminated, as it now has been.

30.     In sum, the relationship between the Howard Firms and Morgan Drexen was purely contractual. Morgan Drexen agreed to provide the services detailed in the MD Administrative Services Contract and the Howard Firms agreed to pay for these services.

1

2

## **Facts Re Vincent Howard's and The W & H's Firm's**

## **Non-involvement In The Action Against Morgan Drexen and Walter Ledda**

3

4

5

31.     The CFPB filed the complaint initiating this case (the "Action") on August 20, 2013 (the "Complaint").

6

7

8

32.     The only parties named in the Complaint were Morgan Drexen and Walter Ledda.

9

10

11

12

33.     Prior to the CFPB's initiating the Action, the agency conducted an investigation for 18 months. During this time, it became aware of Howard Law's contractual use of Morgan Drexen's services.

13

14

15

16

17

18

19

20

34.     When the CFPB subpoenaed certain documents from Morgan Drexen that included or could have included the files of the clients of the Howard Firms, I instructed the company that it was subject to the same Rules of Professional Conduct that governed me. Accordingly, it was not permitted to violate the attorney-client privilege or work product privilege. The company, as far as I am aware, respected my direction.

21

22

23

24

35.     When the CFPB later sought to obtain the files of the Howard Firms' client directly, via a subpoena, I also asserted the attorney-client privilege in response to all demands that called for the production of privileged information.[3] At no time

25

26

27

28

---

[3] Under California law, one of the most fundamental duties of an attorney is "[t]o maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of his or her client." Bus. & Prof. Code, § 6068 (e)(1). Accordingly, an

during this process did the CFPB challenge my assertion regarding the existence of an attorney-client relationship nor did it challenge my assertion of the privilege.

36.     Despite the fact that the CFPB was fully aware of the Howard Firms' business model and its contractual relationship with Morgan Drexen, neither I nor the Howard Firms were named as parties in the Complaint, and none of the allegations in the Complaint imputed any wrongdoing to either myself or the Howard Firms.

37.     Since the filing of the Action through the date of the Injunction, neither I nor Howard Firms have received a notice of any kind relating to any of the filings, hearings, or discovery matters initiated in the Action (other than the CFPB's notice of taking my deposition and the associated non-party subpoena served therewith).

38.     At no time during the Action did the CFPB ever advise me, directly or indirectly, that it was seeking or would seek relief against either myself or the Howard Firms.

39.     As more fully set forth in the concurrently filed Declaration of Lawrence Williamson, Mr. Williamson met with representatives of the CFPB long before that agency initiated the Action and fully explained the relationship between his firm and Morgan Drexen. At no time during or after this meeting did the CFPB ever inform him that they were seeking any relief against either him or his law firm.

---

attorney has a duty to assert the attorney-client privilege to protect confidential communications between the attorney and client. Evid. Code, §§ 952, 954, 955.

40.     I was aware of the fact that Kimberly Pisinski, a lawyer simalrly situated as the Howard Firms- whose law firm also used the services of Morgan Drexen, attempted to intervene in the Action that this relief was denied by the Court.

## Actions After The Entry of The June 18, 2015 Injunction

41.     As explained above, neither I nor either of the Howard Firms was named in, or participated in the Action in any respect until June 18, 2015.

42.     Morgan Drexen filed a bankruptcy petition under Chapter 7 of the bankruptcy code on April 30, 2015, and Jeffrey I. Golden was appointed as Chapter 7 trustee (the "Trustee") in this bankruptcy case. Morgan Drexen later converted its bankruptcy case to a case under Chapter 11 of the bankruptcy code and John Hueston was appointed Chapter 11 trustee. Morgan Drexen' case was reconverted to a Chapter 7 case on June 20, 2015, and Mr. Golden was once again appointed to serve as Chapter 7 trustee.

43.     Although Morgan Drexen filed a bankruptcy case, this entity continued to provide the services described in the MD Administrative Services Contract until June 18, 2015, which is the date that Morgan Drexen ceased operations. This is also the date that this Court entered the judgment against Morgan Drexen that is reflected as Docket No. 306 in the Action (the "Judgment"). The Judgment includes the injunctive relief (the "Injunction") that is the subject of the CFPB's Application for an Order to Show Cause re Contempt (the "Application") against myself, the Howard Firms, and Lawrence Williamson.

9

44.     On or about Monday, May 11, 2015, I was apprised that the Trustee had requested a copy of the entire set of data file of my clients' files that were housed on Morgan Drexen's server. I immediately met with the Trustee's attorney, Evan Borges, and a representative of Glass Ratner, and instructed them that the files that they were requesting were subject to the attorney-client privilege. I further explained that since the Trustee had stepped into the shoes of Morgan Drexen, he was subject to the same contractual obligations as the debtor. I followed up this conversation with an email, dated May 13, 2015, wherein I asserted the attorney-client privilege and I asked to be provided with specific information as to where the data would be stored, and who would have access to it. I was promised by Mr. Borges that this information would not be shared with anyone outside of the Trustee and his counsel.

45.     On June 18, 2015, my counsel appeared at a status conference in the Action for very limited purpose. When I became aware that the Chapter 11 trustee in the Morgan Drexen's bankruptcy case intended to summarily close Morgan Drexen's operations, I directed my counsel to advise the Court of the severe problems that would arise if Morgan Drexen's computer servers were shut down. As indicated in the Transcript of this hearing, at no point during this hearing did either the Court or the CFPB indicate or even suggest that either I or the Howard Firms were subject to the Injunction.

46.     Morgan Drexen effectively ceased operations on June 18, 2015.

47.     Neither I nor the Howard Firms ignored or took any action that was in violation of the Injunction entered on June 18, 2015. To the contrary, I thoroughly read the Injunction, and it was crystal clear that the relief granted therein was granted against Morgan Drexen alone, except in the case of Section II and III thereof. In these sections of the Injunction, the Court expanded the language to include the officers and directors of Morgan Drexen and those in active concert or participation with Morgan Drexen.

48.     At no time since the entry of the Injunction did either I, or the Howard Firms act in concert or in participation with Morgan Drexen in any respect. As a practical matter, it would not have been possible for either I or the Howard Firms to act in concert or participation with Morgan Drexen after the Injunction was entered, since Morgan Drexen ceased operations on the day the Injunction was entered, and at all times after the entry of the Injunction this entity was under the control of the Chapter 7 trustee.

49.     Although the CFPB contends that the Injunction not only encompasses the Howard Firms, but effectively forbids them from being paid by their clients, there is not a word in either the Injunction or in the July 6, 2015 order entered by the Court clarifying this Injunction that support this reading. Again, the "in concert" language in the Injunction refers to solicitations, and as the authorities in the accompanying Response confirm, this language reaches only conduct that is "in concert" with or that aids and abets contemptuous conduct by the enjoined party—Morgan Drexen. That has

11

not occurred and as a practical matter it could not have occurred given Morgan

Drexen's June 18, 2015 closure. Moreover, the Chapter 7 trustee has affirmatively

represented to this Court that Morgan Drexen has fully complied with the Injunction

confirming that no activity has been taken "in concert" with Morgan Drexen that

would be in violation of the Injunction.

50.     The CFPB's untenable attempt to unilaterally modify the Injunction after

the fact to incorporate the Howard Firms, and to thereby deny them the ability to be

paid for the work that they have performed and continue to perform for their clients,

ignores a critical fact: The Howard Firms' are providing services to many of the clients

who fall within the "Affected Consumer" definition in the Injunction that are not debt-

settlement related. Accordingly, the CFPB's proposed after-the-fact rewrite of the

Injunction would effectively deny these clients their choice of counsel, since the

Howard Firms could not continue to provide legal services to these clients without

being paid.

51.     In the Application, the CFPB suggests that the Howard Firms' decision to

employ certain former employees of Morgan Drexen is somehow evidence of

contemptuous conduct. It is not. Most of the people who were hired after Morgan

Drexen closed were low level employees that performed administrative or paralegal

functions. The only two employees that were hired at a higher level, David Walker and

Avi Gupta, were hired on a temporary basis to assist the Howard Firms with trust

12

accounting work, and to develop a software program that would enable the Howard Firms to read their own clients files.

52.     The Howard Firms need for the assistance of Mr. Walker and Mr. Gupta was, in large measure, caused by actions that were taken by the Chapter 7 trustee and the CFPB. As the Court is aware, the Howard Firms attempted to obtain copies of their respective clients' files from the Trustee, and to secure a copy of the MDIS software (the "MDIS Software") that was needed to access these files. As they explained in pleadings previously filed with this Court, without access to this software, the Howard Firms' clients would have been irreparably harmed.

53.     Although the Howard Firms' right to obtain the client files was clearly provided for in the MD Administrative Services Contract, and the Law Firm's right to use the MDIS Software was clearly provided for in the license that was included in this contract, the Trustee was unwilling or unable to provide the Howard Firms the files, and the CFPB sought to deny the firms access to both the files and the MDIS Software needed to read them.

54.     In order to resolve the foregoing problem, the Howard Firms filed an ex parte motion in the Action wherein they sought an order confirming their right to obtain their clients' files and a copy of the MDIS Software that was needed to read these files. This Court's ruling on this motion was issued on July 6, 2015 (the "July 6, 2015 Order").

55.     The July 6, 2015 Order authorized the Trustee to turn over the client files to the Howard Firms, and to the other similarly situated law firms. However, the Court declined to order the Trustee to turnover a copy of the MDIS Software to the law firms.

56.     The Howard Firms and many other attorneys have attempted to receive copies of their files since the entry of this order. However, in the case of the Howard Firms, the Trustee was either unwilling or unable to comply with this demand, since no files were turned over as requested.

57.     The Trustee's inability or unwillingness to allocate the resources necessary to effect the return the files of the Howard Firms clients forced the Howard Firms to seek recourse to the file back-up system that was put in place pursuant to a preexisting IT disaster recovery and business continuity plan (the "Back-up Plan").

58.     The Back-up Plan was put in place in calendar year 2013. In that year, Howard Law engaged Legalsoft, Inc., a Nevada corporation ("Legalsoft'), to back up the data maintained on the Morgan Drexen server. In an abundance of caution, the back-up servers were housed in Nevada.

59.     Under the terms of the Back-up Plan, each of the law firms paid a monthly fee directly to Legalsoft, and Legalsoft, in turn, maintained a back-up copy of each law firm's files, for the benefit of each law firm.

60.     Attached hereto as Exhibit "3" are true and correct copies of invoices from Legalsoft, and the checks confirming that Howard Firms payments to Legalsoft for back-up services.

61.   The Back-up Plan was intended to insure that that Howard Firms had ready access to their client's files in the event that files on Morgan Drexen server could not be accessed. While the more typical causes for loss of access were contemplated fire, water damage, earthquake, or an IT failure, the summary closure of Morgan Drexen on June 18, 2015, and the consequent lack of access to client data, was also the kind of disaster that the Back-up Plan was intended to mitigate.

62.   Pursuant to the foregoing back-up arrangement, the Howard Firms had to obtain their files directly from the Legalsoft server. However, as explained above, this merely provided them a copy of their clients' data. It did not provide them the means to read this data.

63.   To address the foregoing problem, Howard Law hired programmers to write software programs that would enable them to read the client files. Although the new program did provide the Howard Firms' the ability to read these files, the access provided by this program was not complete and the data was presented in a format that was far less clear than the presentation would have been available had access to the MDIS Software been granted. However, this imperfect interface at least enabled the Howard Firms to comply with the obligations that they owed to their clients.

64.   One of the most significant impairments caused by the lack of access to the MDIS Software was bankruptcy related. The new software did not allow the Howard Firms access to the MDIS Software's ABM module – the bankruptcy petition software that Morgan Drexen and the attorneys had used prior to Morgan Drexen's

15

closure.  In order to provide the bankruptcy services demanded by clients, the Howard Firms was forced to licensed software from Best Case, the preeminent provider of bankruptcy preparation software.

65.     In summary, it was the foregoing chain of events that forced the Howard Firms to hire the 50-60 employees from Morgan Drexen, not, as the CFPB suggests, a secret desire to evade the Injunction.

66.     If the Howard Firms had not taken the foregoing actions, their clients would have suffered irreparable harm, since without the assistance of the additional personnel referenced above, the needs of these clients could not have been met.

**Facts Re Allegations of "In Concert" Activity**

67.     Morgan Drexen has been under the control of a bankruptcy trustee since May of 2015, and its business operation has been closed since the day the Injunction was entered.

68.     Neither I, nor the Howard Firms have acted "in concert" with, or in any way aided, abetted or participated in any activity, of any kind, by Morgan Drexen since June 18, 2015.

69.     As a practical matter, any "in concert" course of conduct with Morgan Drexen would  have been impossible after June 18, 2015, since there was no one left to act "in concert" with. Again, as indicated above, the business was closed on that date. Moreover, since Morgan Drexen has been under the control of bankruptcy trustee since May of 2015, any "in concert" activity with Morgan Drexen would have required the

1    the Section 341(a) meeting. We had no reason to, since we have not filed claims

2    against the bankruptcy estate of this entity.

3

4         I declare that the foregoing is true and correct under the penalty of perjury.

5         Executed in Orange County, California, on August 26, 2015.

6

7

8

9

10                                   Vincent Howard

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20

9:31 AM
08/24/15

**LegalSoft Inc.**
# Customer QuickReport
### November 1, 2012 through August 24, 2015

| Type | Date | Num | Memo | Account | Clr | Split | Amount |
|------|------|-----|------|---------|-----|-------|--------|
| Howard Law, P.C. | | | | | | | |
| Invoice | 07/09/2013 | 39 | | Accounts Receivable | | -SPLIT- | 6,677.45 |
| Payment | 07/09/2013 | | | Undeposited Funds | X | Accounts Rec... | 6,677.45 |
| Invoice | 08/09/2013 | 81 | | Accounts Receivable | | -SPLIT- | 6,702.70 |
| Payment | 08/12/2013 | | | Undeposited Funds | X | Accounts Rec... | 6,702.70 |
| Invoice | 09/13/2013 | 121 | | Accounts Receivable | | -SPLIT- | 6,934.81 |
| Payment | 09/13/2013 | | | Undeposited Funds | X | Accounts Rec... | 6,934.81 |
| Invoice | 11/04/2013 | 157 | | Accounts Receivable | | -SPLIT- | 7,032.73 |
| Payment | 11/05/2013 | | | Undeposited Funds | X | Accounts Rec... | 7,032.73 |
| Invoice | 11/18/2013 | 197 | | Accounts Receivable | | -SPLIT- | 7,048.54 |
| Payment | 11/18/2013 | | | Undeposited Funds | X | Accounts Rec... | 7,048.54 |
| Invoice | 12/19/2013 | 238 | | Accounts Receivable | | -SPLIT- | 7,054.34 |
| Payment | 12/19/2013 | | | Undeposited Funds | X | Accounts Rec... | 7,054.34 |
| Invoice | 01/16/2014 | 281 | | Accounts Receivable | | -SPLIT- | 7,072.86 |
| Payment | 01/16/2014 | | | Undeposited Funds | X | Accounts Rec... | 7,072.86 |
| Invoice | 02/13/2014 | 323 | | Accounts Receivable | | -SPLIT- | 7,115.95 |
| Payment | 02/13/2014 | | | Undeposited Funds | X | Accounts Rec... | 7,115.95 |
| Invoice | 03/17/2014 | 366 | | Accounts Receivable | | -SPLIT- | 7,160.72 |
| Payment | 03/18/2014 | | | Undeposited Funds | X | Accounts Rec... | 7,160.72 |
| Invoice | 04/15/2014 | 424 | | Accounts Receivable | | -SPLIT- | 7,227.55 |
| Payment | 04/24/2014 | | | Bank of America | X | Accounts Rec... | 7,227.55 |
| Invoice | 05/29/2014 | 464 | | Accounts Receivable | | -SPLIT- | 7,310.07 |
| Invoice | 06/23/2014 | 504 | | Accounts Receivable | | -SPLIT- | 7,324.18 |
| Invoice | 07/22/2014 | 544 | | Accounts Receivable | | -SPLIT- | 7,311.06 |
| Invoice | 08/26/2014 | 584 | | Accounts Receivable | | -SPLIT- | 7,323.70 |
| Invoice | 09/23/2014 | 624 | | Accounts Receivable | | -SPLIT- | 7,272.85 |
| Invoice | 10/28/2014 | 664 | | Accounts Receivable | | -SPLIT- | 7,262.00 |
| Invoice | 11/24/2014 | 704 | | Accounts Receivable | | -SPLIT- | 7,206.33 |
| Invoice | 12/18/2014 | 744 | | Accounts Receivable | | -SPLIT- | 7,178.57 |
| Payment | 01/02/2015 | | | Bank of America | | Accounts Rec... | 14,634.25 |
| Invoice | 08/24/2015 | 777 | | Accounts Receivable | | -SPLIT- | 7,178.57 |

000037

# Invoice

LegalSoft Inc.

3540 W Sahara Ave E6
Las Vegas, NV 89102

| Date | Invoice # |
|------|-----------|
| 11/24/2014 | 704 |

| Bill To |
|---------|
|  |

| Ship To |
|---------|
|  |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
|  |  |  | 11/24/2014 |  |  |  |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
|  | Services |  | 7,206.33 | 7,206.33T |
|  |  | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

| | Total | $7,206.33 |
|---|-------|-----------|

000038

8/21/2015
Bank of America | Online Banking | Accounts | Account Details | Account Activity

Case 8:13-cv-01267-JLS-JEM   Document 356-1   Filed 08/26/15   Page 40 of 43   Page ID
#:30954

Bank of America

Online Banking

## Business Fundamentals Chk - 5123: Account Activity Transaction Details

**Post date:** 05/07/2015

**Amount:** 26,674.04

**Type:** Deposit

**Description:** Deposit



**Bank of America** 〰    Case 8:13-cv-01267-JLS-JEM   Document 356-1   Filed 08/26/15   Page 41 of 43   Page ID   **Online Banking**
#:30955

## Business Fundamentals Chk - 5123: Account Activity Transaction Details

**Post date:** 03/13/2015

**Amount:** 31,791.94

**Type:** Deposit

**Description:** Deposit



Case 8:13-cv-01197-JLS-JEM   Document 356-1   Filed 08/26/15   Page 42 of 43   Page ID
#:30956

Bank of America 🦅🦅🦅                                                         Online Banking

## Business Fundamentals Chk - 5123: Account Activity Transaction Details

|  |  |
|---|---|
| **Post date:** | 02/09/2015 |
| **Amount:** | 25,885.12 |
| **Type:** | Deposit |
| **Description:** | Deposit |



Case 16-03013-rld   Doc 48-1   Filed 11/04/16                UST Exhibit 6 - Page 23 of 24
https://secure.bankofamerica.com/myaccounts/details/deposit/previous-page.go?skip=true&adx=5edaf0244a45c81fd150b8edfb0d02842c57c8c5f17910d40be29...   1/1

**Bank of America**                                **Online Banking**

## Business Fundamentals Chk - 5123: Account Activity Transaction Details

|  |  |
|---|---|
| **Post date:** | 01/02/2015 |
| **Amount:** | 27,387.15 |
| **Type:** | Deposit |
| **Description:** | Deposit |





000042

# Exhibit 7

# Howard Law, PC
## Balance Sheet
### As of Dec. 31, 2014

| | QB - Dec. 31, 2014 | MAS - Dec. 31, 201 | Eliminations | Consolidation |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Checking/Savings** | | | | |
| Client Trust Account | 4,125.00 | 1,020,080.89 | | 1,024,205.89 |
| General HNPC | | | | |
| General -9279 | 8,438.16 | 89,749.27 | | 98,187.43 |
| OPERATING ACCT 1524 | 15,195.56 | | | 15,195.56 |
| R X Account | 380.77 | 380.77 | | 761.54 |
| **Total Checking/Savings** | 28,139.49 | 1,110,210.93 | | 1,138,350.42 |
| Accounts Receivable | 21,699.41 | 15,842,709.77 | (11,848,355.39) | 4,016,053.79 |
| **Other Current Assets** | | | | |
| Advanced Client Costs | 39,969.86 | | | 39,969.86 |
| Prepaid Expense | 1,823.92 | | | 1,823.92 |
| **Total Other Current Assets** | 41,793.78 | 0.00 | | 41,793.78 |
| **Total Current Assets** | 91,632.68 | 16,952,920.70 | | 5,196,197.99 |
| **Fixed Assets** | 0.00 | 0.00 | | 0.00 |
| **Other Assets** | 0.00 | 4,260.00 | | 4,260.00 |
| **TOTAL ASSETS** | 91,632.68 | 16,957,180.70 | | 5,200,457.99 |
| **LIABILITIES & EQUITY** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | 57.70 | 15,917,396.61 | (11,848,355.39) | 4,069,098.92 |
| Credit Cards | 13,711.59 | | | 13,711.59 |
| **Other Current Liabilities** | | | | |
| Client Trust Payable HL | 3,375.00 | 1,035,545.15 | | 1,038,920.15 |
| Loan Payable RX Account | 3,373.25 | 13,000.00 | | 16,373.25 |
| **Total Other Current Liabilities** | 6,748.25 | 1,048,545.15 | | 1,055,293.40 |
| **Total Current Liabilities** | 20,517.54 | 16,965,941.76 | | 5,138,103.91 |
| **LT Capital Leases** | 0.00 | 0.00 | | |
| **Total Liabilities** | 20,517.54 | 16,965,941.76 | | 5,138,103.91 |
| **Equity** | | | | |
| Capital Stock | 1,000.00 | | | 1,000.00 |
| Partner Draw | -62,783.12 | | | (62,783.12) |
| Partner Equity | 26,530.02 | | | 26,530.02 |
| Retained Earnings | 85,309.17 | (8,781.06) | | 76,548.11 |
| Net Income | 21,059.07 | | | 21,059.07 |
| **Total Equity** | 71,115.14 | (8,781.06) | | 62,354.08 |
| **TOTAL LIABILITIES & EQUITY** | 91,632.68 | 16,957,180.70 | | 5,200,457.99 |



2014

SPA 0001
Case 16-03013-rld    Doc 48-1    Filed 11/04/16    UST Exhibit 7 - Page 1 of 8

# Howard Law, PC
## Profit & Loss
### January 2014 through December 2014

| | QB - Jan - Dec 14 | MAS -Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| **Legal Fee Income** | | | |
| **Legal Fee Discount** | - | - | - |
| **Local Counsel** | 10,628.35 | - | 10,628.35 |
| **Legal Fee Income - Other** | 727,181.25 | 82,599.00 | 809,780.25 |
| **Total Legal Fee Income** | 737,809.60 | 82,599.00 | 820,408.60 |
| | | | |
| **Consumer Protection Services** | | 3,831,207.42 | 3,831,207.42 |
| **Referral Fee** | 14,112.53 | - | 14,112.53 |
| **Rental Income** | 500.00 | - | 500.00 |
| **Total Income** | 752,422.13 | 3,913,806.42 | 4,666,228.55 |
| | | | |
| **Expense** | | | |
| **Advertising and Promotion** | | | |
| **Blog Writing** | 150.00 | - | 150.00 |
| **Leads** | | | |
| **Employment-Marketing Esq LL** | - | - | - |
| **Employment-OLM** | 3,000.00 | - | 3,000.00 |
| **Loan Mod-Powers Marketing G** | 2,549.25 | - | 2,549.25 |
| **Personal Injury-Egeneration** | 1,100.00 | - | 1,100.00 |
| **Personal Injury-Walker Adver** | 11,724.00 | - | 11,724.00 |
| **SSD-NOLO** | 7,065.00 | - | 7,065.00 |
| **Wrongful Foreclosure-Attyatlav** | - | - | - |
| **Leads - Other** | - | - | - |
| **Leads** | 25,438.25 | - | 25,438.25 |
| **Marketing** | 1,093.34 | - | 1,093.34 |
| **Media** | 1,772.38 | - | 1,772.38 |
| **Print** | 3,298.77 | - | 3,298.77 |
| **Web** | 8,235.58 | - | 8,235.58 |
| **Total Advertising and Promotion** | 39,988.32 | - | 39,988.32 |
| | | | |
| **Automobile Expense** | 34,252.37 | - | 34,252.37 |
| **Bank Service Charges** | 1,620.43 | 3,119.53 | 4,739.96 |
| **Business Licenses and Permits** | 276.00 | - | 276.00 |
| **Client Advance Expense** | 136.65 | - | 136.65 |
| **Continuing Education** | 4,497.40 | - | 4,497.40 |
| **Contributions** | 4,605.00 | - | 4,605.00 |
| **Dues and Subscriptions** | | | |
| **Organization Cost-AAJ** | 5,838.07 | - | 5,838.07 |
| **Organization Cost-CAALA** | 1,098.88 | - | 1,098.88 |
| **Organization Cost-CAOC** | 9,859.76 | - | 9,859.76 |
| **Organization Cost-OCTLA** | 295.86 | - | 295.86 |
| **Dues and Subscriptions - Other** | 32,052.24 | - | 32,052.24 |

# Howard Law, PC
## Profit & Loss
### January 2014 through December 2014

| | QB - Jan - Dec 14 | MAS -Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| **Dues and Subscriptions** | 49,144.81 | - | 49,144.81 |
| **Employee Benefits** | 19,674.22 | - | 19,674.22 |
| **Engaged Attorney** | - | 536,171.10 | 536,171.10 |
| **Filing Fees** | 1,510.00 | - | 1,510.00 |
| **Insurance Expense** | | | |
|    General Liability Insurance | 1,204.56 | - | 1,204.56 |
|    Health Insurance | (1,596.52) | - | (1,596.52) |
|    Worker's Compensation | 3,135.70 | - | 3,135.70 |
| **Insurance Expense** | 2,743.74 | - | 2,743.74 |
| **Legal Services** | - | 537,108.27 | 537,108.27 |
| **Library** | | | |
|    Library - On Line | (8,783.24) | - | (8,783.24) |
|    Library - print | - | - | - |
| **Total Library** | (8,783.24) | - | (8,783.24) |
| **Meals and Entertainment** | | | |
|    Staff Meals | 2,087.83 | - | 2,087.83 |
|    Meals and Entertainment - Other | 33,172.66 | - | 33,172.66 |
| **Total Meals and Entertainment** | 35,260.49 | - | 35,260.49 |
| **Miscellaneous Expense** | 4,419.45 | - | 4,419.45 |
| **OD & IT Support** | - | 86,765.84 | 86,765.84 |
| **Office Supplies** | 4,785.22 | - | 4,785.22 |
| **Parking Expnses** | 10.50 | - | 10.50 |
| **Payroll Expenses** | | | |
|    401(k) Matching | 9,200.61 | - | 9,200.61 |
|    Bonus | 25,826.25 | - | 25,826.25 |
|    Holiday | 2,294.00 | - | 2,294.00 |
|    Overtime | 5,247.62 | - | 5,247.62 |
|    Payroll Tax | 32,295.92 | - | 32,295.92 |
|    Regular | 382,822.87 | - | 382,822.87 |
|    Sick | 2,271.51 | - | 2,271.51 |
|    Vacation | 1,447.33 | - | 1,447.33 |
|    Payroll Expenses - Other | 1,145.40 | - | 1,145.40 |
| **Payroll Expenses** | 462,551.51 | - | 462,551.51 |
| **Postage and Delivery** | 2,441.06 | - | 2,441.06 |
| **Printing and Reproduction** | 182.06 | - | 182.06 |
| **Professional Fees** | 57,484.78 | - | 57,484.78 |
| **Repairs & Maintenance** | - | - | - |
| **Research Services** | 18.07 | - | 18.07 |
| **Staff Meeting** | 598.70 | - | 598.70 |

# Howard Law, PC
## Profit & Loss
### January 2014 through December 2014

| | QB - Jan - Dec 14 | MAS -Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| Servicing Fees | - | 2,750,641.68 | 2,750,641.68 |
| Storage | 909.68 | - | 909.68 |
| Suspense | - | - | - |
| Telephone Expense | 2,484.04 | - | 2,484.04 |
| Travel Expense | 9,789.82 | - | 9,789.82 |
| Total Expense | 730,601.08 | 3,913,806.42 | 4,644,407.50 |
| | | | |
| Net Ordinary Income | 21,821.05 | - | 21,821.05 |
| | | | |
| Other Income/Expense | | | |
| Other Expense | | | |
| Corporation Tax | 800.00 | - | 800.00 |
| Political Contributions | - | - | - |
| Total Other Expense | 800.00 | - | 800.00 |
| | | | |
| Net Other Income | (800.00) | - | (800.00) |
| | | | |
| Net Income | 21,021.05 | - | 21,021.05 |

SPA 0004
Case 16-03013-rld    Doc 48-1    Filed 11/04/16    UST Exhibit 7 - Page 4 of 8

# Howard Law, PC
## Balance Sheet
### As of Dec. 31, 2015

| | QB | MAS | Eliminations | Consolidation |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Checking/Savings** | | | | |
| Client Trust Account | 3,768.56 | 882,400.03 | | 886,168.59 |
| General HNPC | | 3,199.88 | | 3,199.88 |
| General -9279 | 16,552.62 | -6,056.18 | | 10,496.44 |
| OPERATING ACCT 1524 | 32,911.54 | | | 32,911.54 |
| R X Account | 0.00 | 0.00 | | 0.00 |
| **Total Checking/Savings** | 53,250.72 | 879,543.73 | | 932,794.45 |
| | | | | |
| Accounts Receivable | 128,592.71 | 1,035,084.58 | (1,140,137.72) | 23,539.57 |
| **Other Current Assets** | | | | |
| Advanced Client Costs | 44,299.87 | 13,468,318.94 | -13,468,318.94 | 44,299.87 |
| Prepaid Expense | 11,149.15 | | | 11,149.15 |
| **Total Other Current Assets** | 55,449.02 | 13,468,318.94 | | 55,449.02 |
| | | | | |
| **Total Current Assets** | 237,292.45 | 15,382,947.25 | | 1,011,783.04 |
| | | | | |
| **Fixed Assets** | 51,635.98 | 0.00 | | 51,635.98 |
| | | | | |
| **Other Assets** | 607.00 | 59,001.66 | | 59,608.66 |
| | | | | |
| **TOTAL ASSETS** | 289,535.43 | 15,441,948.91 | | 1,123,027.68 |
| | | | | |
| **LIABILITIES & EQUITY** | | | | |
| **Liabilities** | | | | |
| **Current Liabilities** | | | | |
| Accounts Payable | 54,650.81 | 14,002,754.49 | (13,468,318.94) | 589,298.36 |
| Credit Cards | 28,081.38 | | | 28,081.38 |
| Accrued Payroll | | 66,259.27 | | 66,259.27 |
| **Other Current Liabilities** | | | | |
| Client Trust Payable HL | 3,038.56 | 1,136,529.96 | | 1,139,568.52 |
| Settlements Due | 9,587.25 | | | 9,587.25 |
| Loan Payable RX Account | 4,260.00 | | | 4,260.00 |
| **Total Other Current Liabilities** | 16,883.81 | 1,136,529.96 | | 1,153,413.77 |
| | | | | |
| **Total Current Liabilities** | 99,625.98 | 15,205,543.72 | | 1,837,050.78 |
| | | | | |
| **LT Capital Leases** | 0.00 | 0.00 | | |
| | | | | |
| **Total Liabilities** | 99,625.98 | 15,205,543.72 | | 1,837,050.78 |
| | | | | |
| **Equity** | | | | |
| Capital Stock | 1,000.00 | | | 1,000.00 |
| Partner Draw | -62,783.12 | | | (62,783.12) |
| Partner Equity | 26,530.02 | | | 26,530.02 |
| Retained Earnings | 106,368.24 | (8,781.06) | | 97,607.18 |
| Net Income | 118,594.31 | 245,186.25 | (1,140,137.72) | -776,377.16 |
| **Total Equity** | 189,709.45 | 236,405.19 | | (714,023.08) |
| | | | | |
| **TOTAL LIABILITIES & EQUITY** | 289,535.43 | 15,441,948.91 | | 1,123,027.68 |



2015

# Howard Law, PC
# Profit & Loss
### January 2014 through December 2014

| | QB - Jan - Dec 14 | MAS -Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| **Ordinary Income/Expense** | | | |
| **Income** | | | |
| **Legal Fee Income** | | | |
| Legal Fee Discount | 833.25 | - | 833.25 |
| Local Counsel | 4,374.75 | - | 4,374.75 |
| Legal Fee Income - Other | 2,554,386.90 | - | 2,554,386.90 |
| **Total Legal Fee Income** | 2,559,594.90 | - | 2,559,594.90 |
| | | | |
| Consumer Protection Services | | 3,584,353.02 | 3,584,353.02 |
| Referral Fee | 3,858.00 | - | 3,858.00 |
| Rental Income | - | - | - |
| **Total Income** | 2,563,452.90 | 3,584,353.02 | 6,147,805.92 |
| | | | |
| **Expense** | | | |
| **Advertising and Promotion** | | | |
| Blog Writing | | - | - |
| **Leads** | | | |
| Employment-Marketing Esq LL | - | - | - |
| Employment-OLM | - | - | - |
| Loan Mod-Powers Marketing G | - | - | - |
| Personal Injury-Egeneration | - | - | - |
| Personal Injury-Walker Adver | - | - | - |
| SSD-NOLO | - | - | - |
| Wrongful Foreclosure-Attyatlav | - | - | - |
| Leads - Other | - | - | - |
| **Leads** | - | - | - |
| Marketing | 26,670.62 | 386,217.09 | 412,887.71 |
| Media | 4,144.80 | 319,523.92 | 323,668.72 |
| Print | 2,474.00 | - | 2,474.00 |
| Web | 8,965.15 | - | 8,965.15 |
| **Total Advertising and Promotion** | 42,254.57 | 705,741.01 | 747,995.58 |
| | | | |
| Automobile Expense | 25,093.54 | - | 25,093.54 |
| Bank Service Charges | 10,945.39 | 303,119.63 | 314,065.02 |
| Business Licenses and Permits | 100.00 | 737.00 | 837.00 |
| Commissions | 17,000.00 | | |
| Client Advance Expenses | 22,746.79 | - | 22,746.79 |
| Continuing Education | 154.00 | - | 154.00 |
| Contributions | 585.00 | - | 585.00 |
| **Dues and Subscriptions** | | | |
| Organization Cost-AAJ | 520.00 | - | 520.00 |
| Organization Cost-CAALA | - | - | - |
| Organization Cost-CAOC | 357.15 | - | 357.15 |
| Organization Cost-OCTLA | 873.32 | - | 873.32 |

Page 1 of 3

# Howard Law, PC
## Profit & Loss
### January 2014 through December 2014

| | QB - Jan - Dec 14 | MAS - Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| Dues and Subscriptions - Other | 11,977.18 | 970.64 | 12,947.82 |
| **Dues and Subscriptions** | 13,727.65 | 970.64 | 14,698.29 |
| | | | |
| **Employee Benefits** | 141,521.02 | - | 141,521.02 |
| | | | |
| **Engaged Attorney** | - | - | - |
| **Filing Fees** | 1,035.52 | - | 1,035.52 |
| **Insurance Expense** | | | |
| General Liability Insurance | 85,588.61 | 3,466.75 | 89,055.36 |
| Health Insurance | (21,346.29) | - | (21,346.29) |
| Worker's Compensation | 5,029.73 | - | 5,029.73 |
| **Insurance Expense** | 69,272.05 | 3,466.75 | 72,738.80 |
| **Legal Services** | - | 417,997.86 | 417,997.86 |
| | | | |
| Library | | | |
| Library - On Line | (2,817.78) | - | (2,817.78) |
| Library - print | - | - | - |
| **Total Library** | (2,817.78) | - | (2,817.78) |
| | | | |
| Meals and Entertainment | | | |
| Staff Meals | 723.29 | 3,268.54 | 3,991.83 |
| Meals and Entertainment - Other | 5,622.88 | - | 5,622.88 |
| **Total Meals and Entertainment** | 6,346.17 | 3,268.54 | 9,614.71 |
| | | | |
| **Miscellaneous Expense** | 37,388.97 | - | 37,388.97 |
| | | | |
| **OD & IT Support** | - | 462,650.61 | 462,650.61 |
| **Office Supplies** | 4,316.96 | 50,960.52 | 55,277.48 |
| **Parking Expnses** | 9.00 | - | 9.00 |
| **Payroll Expenses** | | | |
| 401(k) Matching | 7,862.11 | - | 7,862.11 |
| Bonus | 33,675.00 | - | 33,675.00 |
| Holiday | 10,778.90 | - | 10,778.90 |
| Overtime | 50,186.86 | - | 50,186.86 |
| Payroll Tax | 130,689.66 | - | 130,689.66 |
| PTO | 19,053.50 | | |
| Regular | 1,370,555.18 | - | 1,370,555.18 |
| Sick | 5,841.89 | - | 5,841.89 |
| Vacation | 7,110.32 | 66,259.27 | 73,369.59 |
| Payroll Expenses - Other | 12,284.61 | - | 12,284.61 |
| **Payroll Expenses** | 1,648,038.03 | 66,259.27 | 1,714,297.30 |
| **Postage and Delivery** | 53,691.35 | 61,941.12 | 115,632.47 |
| **Printing and Reproduction** | - | 15,599.73 | 15,599.73 |
| **Professional Fees** | 182,966.23 | - | 182,966.23 |
| **Referral Expense** | 15,117.64 | | |

# Howard Law, PC
## Profit & Loss
### January 2014 through December 2014

|  | QB - Jan - Dec 14 | MAS -Jan - Jun 15 | Cons 2014 |
|---|---|---|---|
| Rent |  | 174,437.93 |  |
| Repairs & Maintenance | 49,266.15 | 18,549.89 | 67,816.04 |
| Research Services | 23,445.09 | - | 23,445.09 |
| Staff Meeting | 21.10 | - | 21.10 |
| Servicing Fees | - | 919,520.33 | 919,520.33 |
| Storage | 1,503.06 | - | 1,503.06 |
| Suspense | - | - | - |
| Telephone Expense | 19,888.97 | 131,791.80 | 151,680.77 |
| Travel Expense | 7,190.49 | 2,173.54 | 9,364.03 |
| **Total Expense** | 2,390,806.96 | 3,339,186.17 | 5,729,993.13 |
|  |  |  |  |
| **Net Ordinary Income** | 172,645.94 | 245,166.85 | 417,812.79 |
|  |  |  |  |
| Other Income/Expense |  |  |  |
| Other Income/(Expense) |  |  |  |
| Corporation Tax | (3,752.00) | - | (3,752.00) |
| Interest Income | 0.37 |  |  |
| Legal Settlement | (50,300.00) | - | (50,300.00) |
| **Total Other Expense** | (54,051.63) | - | (54,051.63) |
|  |  |  |  |
| **Net Income** | 118,594.31 | 245,166.85 | 363,761.16 |

**Exhibit 8**

```
 1            IN THE UNITED STATES BANKRUPTCY COURT

 2                 FOR THE DISTRICT OF OREGON

 3

 4   In Re:                        )

 5   CHERYL KAE STITES             )NO. 14-35071

 6   KATHLEEN ARTHUR               )NO. 15-62393

 7   MARY ANN MICHIKO ROBERTS      )NO. 15-63116

 8   _____)

 9   UNITED STATES TRUSTEE,        )
            Plaintiff,             )
10                                 )
     VS.                           )ADV. NO. 16-3013-rld
11                                 )ADV. NO. 16-6061-rld
     VINCENT HOWARD, HOWARD LAW, PC, )ADV. NO. 16-6062-rld
12   ERIK GRAEFF, LAW OFFICES OF   )
     ERIK GRAEFF, PC,              )
13          Defendants.            )

14                DEPOSITION OF ERIK GRAEFF

15              TAKEN ON BEHALF OF PLAINTIFF

16                        * * *

17        BE IT REMEMBERED THAT, pursuant to the Federal

18   Rules of Civil Procedure, the deposition of ERIK GRAEFF

19   was taken before Paula D. Tieger, a Registered

20   Professional Reporter and Notary Public for the State of

21   Oregon, on September 19, 2016, commencing at the hour of

22   9:02 a.m., in the Office of the United States Trustee,

23   620 SW Main Street, Suite 213, Portland, Oregon.

24

25                        * * *
```

```
 1                    APPEARANCES:

 2    Department of Justice, U.S. Trustee's Office
           By: Carla G. McClurg
 3              Assistant United States Attorney
                620 SW Main Street, Suite 213
 4              Portland, Oregon 97205
                503-326-7659
 5              carla.mcclurg@usdoj.gov
                   Counsel for the Plaintiff
 6

 7    The Scott Law Group
           By: Loren S. Scott
 8              Attorney at Law
                2350 Oakmont Way, Suite 106
 9              Eugene, Oregon 97401
                541-868-8005
10              ecf@scott-law-group.com
                   Counsel for Erik Graeff & The Law Offices
11                 of Erik Graeff, PC

12    Motschenbacher & Blattner, LLP
           By:  Nicholas J. Henderson
13              Attorney at Law
                117 SW Taylor Street, Suite 300
14              Portland, Oregon 97204
                503-417-0500
15              nhenderson@portlaw.com
                   Counsel for Vincent Howard &
16                 Howard Law, PC

17    Jeffrey Katz (By Phone)
      Attorney at Law
18    1919 N. Heliotrope Drive
      Santa Ana, California 92706
19    714-296-8309
           Counsel for Vincent Howard & Howard Law, PC
20

21    Also Present:  Sarah Troutt - Professional Liability
                      Fund
22

23

24                    * * *

25
```

1   other on some pretty key issues of services that were to

2   be provided or not.

3   Q    And why did you direct this communication to Mr. Katz

4   as opposed to someone else?

10:50:23   5   A    Mr. Katz was the one who had -- I think he was

6   general counsel of Morgan Drexen.  And whenever I needed

7   something that was very important, I could call him.

8   Q    Did you send a similar letter to Mr. Howard?

9   A    No.

10:50:48   10   Q    Why not?

11   A    Because I knew that Mr. Katz and Mr. Howard were very

12   close, and they had offices right across the way.  They

13   would know -- if I sent this to Jeff Katz, that

14   Mr. Howard would get the word as well.

10:51:03   15   Q    So Morgan Drexen was in the same building as Howard

16   Law; is that correct?

17   A    Yes.

18   Q    So you explained some kind of office proximity

19   between Mr. Katz and Mr. Howard.

10:51:15   20        Can you explain how it is that you became aware

21   as to the physical proximity and how close their offices

22   were to one another?

23   A    Well, I've been there a couple times to Costa Mesa.

24   Q    All right.  And where was Mr. Katz's office in

10:51:33   25   relation to Mr. Howard's?

| | | |
|---|---|---|
| | 1 | A    I think it's on the same floor. |
| | 2 | Q    At the time that you visited the building, were there |
| | 3 | other tenants in the building besides Howard Law and |
| | 4 | Morgan Drexen? |
| 10:51:54 | 5 | A    I don't think so. |
| | 6 | Q    All right.  So the first paragraph says, I write this |
| | 7 | letter with a great deal of regret.  Please terminate our |
| | 8 | contract and arrange for the ending of any and all |
| | 9 | services Morgan Drexen performs for my firm in any state. |
| 10:52:20 | 10 | Please wrap up our affairs consisting of any trust |
| | 11 | account issues and client transfer issues, and you are |
| | 12 | now only authorized to use my signature in matters that |
| | 13 | pertain to wrapping up our affairs and transferring |
| | 14 | clients to a different law firm and closing any trust |
| 10:52:36 | 15 | accounts. |
| | 16 | Okay.  So up until that point of this letter, can |
| | 17 | you describe to me what happened after you had requested |
| | 18 | that Mr. Katz wrap up what you described as "our |
| | 19 | affairs"? |
| 10:52:50 | 20 | A    What happened? |
| | 21 | Q    Yes. |
| | 22 | A    What happened before or after or... |
| | 23 | Q    After.  After you communicated -- |
| | 24 | A    After this letter? |
| 10:53:00 | 25 | Q    Yes. |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | Q    Was that based on your of counsel relationship with     |
|          | 2  | Howard Law?                                                  |
|          | 3  | A    Yes.                                                    |
|          | 4  | Q    And your relationship with Howard Nassiri prior to      |
| 02:41:45 | 5  | that?                                                        |
|          | 6  | A    Yes.                                                    |
|          | 7  | Q    So if it's a Howard Law client or a Howard Nassiri      |
|          | 8  | client, that entity would control the file and the          |
|          | 9  | relationship with the client, would they not?               |
| 02:41:55 | 10 | A    Yes.                                                    |
|          | 11 | Q    All right.  And if it was a client of yours separate    |
|          | 12 | and apart from your relationship with Howard Law or          |
|          | 13 | Howard Nassiri, you would control the file and the           |
|          | 14 | relationship; correct?                                       |
| 02:42:08 | 15 | A    That's correct.                                         |
|          | 16 | Q    For those clients that came to you through Morgan       |
|          | 17 | Drexen for which you were engagement counsel, did Howard     |
|          | 18 | Law have any access to those files, to your knowledge?      |
|          | 19 | A    I don't know.                                           |
| 02:42:26 | 20 | Q    Who would know that?                                     |
|          | 21 | A    Jeff Katz, probably.                                     |
|          | 22 | Q    Anyone else?                                             |
|          | 23 | A    Howard Law.                                              |
|          | 24 | Q    Okay.  Earlier, we looked at -- I apologize.  One       |
| 02:42:49 | 25 | moment.  Exhibit 16; it's a letter dated December 11th,      |

# Exhibit 9

1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **CENTRAL DISTRICT OF CALIFORNIA**
10

11  CONSUMER FINANCIAL PROTECTION        CASE NO. SACV 13-1267-JLS (JEMx)
    BUREAU,
12

13          Plaintiff,                            **ORDER (1) GRANTING PLAINTIFF'S**
                                                  **MOTION FOR SANCTION OF**
14                                                **DEFAULT JUDGMENT AGAINST**
        vs.                                       **MORGAN DREXEN, INC. (Docs. 255-2,**
15                                                **274) AND (2) REQUIRING**
16  MORGAN DREXEN, INC., ET AL.,                  **SUPPLEMENTAL BRIEFING AS TO**
                                                  **DEFENDANT WALTER LEDDA**
17          Defendants.
18

19
20
21
22
23
24
25
26
27
28

1

I.      **INTRODUCTION**

Before the Court is a Motion for Sanctions filed by Plaintiff Consumer Financial Protection Bureau (the "Bureau"). (Mot., Docs. 255-2, 274.)  Defendants Morgan Drexen Inc. and Walter Ledda filed an Opposition, and Plaintiff replied.  (Opp'n, Doc. 261; Reply, Doc. 262.)  After considering the briefing and supporting documentation submitted by the parties, holding an evidentiary hearing, and taking the matter under submission, the Court GRANTS Plaintiff's Motion for Sanctions against Defendant Morgan Drexen Inc. and ORDERS supplemental briefing regarding the potential personal liability of Defendant Walter Ledda and whether default judgment should be entered against him as well.

II.     **BACKGROUND**

Morgan Drexen, Inc. has been in business since 2007.[1]  Defendant Walter Ledda is the Chief Executive Officer of Morgan Drexen and has been a member of the company's Board of Directors since May 21, 2007.  Morgan Drexen provides debt settlement and bankruptcy services to attorneys and consumers.  Specifically, Morgan Drexen works with attorneys to service clients who are subject to actions and lawsuits by organizations within the debt collection industry.

Prior to October 27, 2010, the effective date for recent amendments to the Telemarketing Sales Rule ("TSR"), consumers paid the attorneys that contract with Morgan Drexen an up-front engagement fee and a monthly fee for debt settlement services. However, in 2009, Morgan Drexen became aware of proposed amendments to the TSR that would ban advance fees for debt settlement services.  Morgan Drexen considered the proposed amendments to be a threat to its business.  As the October 27, 2010 effective date approached, Morgan Drexen began contracting with attorneys to not only offer debt settlement services to customers, but also offer bankruptcy services.  Customers are

---

[1]  Unless otherwise noted, all facts in this section were undisputed by Defendants in their Statement of Genuine Issues of Fact.  (Doc. 188-1.)

1   required to sign separate contracts for the debt settlement services and bankruptcy services.

2   Under the debt settlement contract, the consumer pays no up-front fees.  Under the

3   bankruptcy services contract, the consumer must pay an up-front engagement fee and a

4   monthly maintenance fee.

5         On August 20, 2013, the Bureau filed suit against Defendants.  The Complaint

6   asserts six claims, four for violations of both the TSR, 16 C.F.R. § 310, and the Consumer

7   Financial Protection Act ("CFPA"), 12 U.S.C. §§ 5531, 5536(a)(1), and two solely for

8   violations of the CFPA.  The Bureau alleges, among other things, that Defendants violated

9   the TSR and the CFPA by (1) requesting or receiving up-front fees for debt relief services,

10  and (2) representing to consumers that they will not be charged advance fees for debt relief

11  services, but in fact charging such fees.  In short, the Bureau claims that Defendants

12  bundled unnecessary bankruptcy services into the package to disguise the fact that they

13  continued to charge an upfront fee for what were essentially debt relief services.

14

15         **A.      The Parties' Motions for Summary Judgment**

16         On October 7, 2014, Defendants filed a motion for partial summary judgment, and

17  on October 8, 2014, the Bureau filed a motion for summary judgment.  On November 25,

18  2014, the Court issued an Order regarding the parties' motions for summary judgment,

19  relying on the following evidence concerning Defendants' debt settlement and bankruptcy

20  services:

21

22         Between October 27, 2010 and August 31, 2014, 95% of Morgan Drexen's

23         customers signed up for both debt settlement and bankruptcy services.  ([Defs'

24         SGI] ¶ 124.)   Approximately 93% of those enrolled in both services were

25         charged an up-front fee.  (Id. ¶ 128.)  However, of those enrolled in both

26         services during that time period, somewhere between 0.897% and 5.1% filed a

27

28

1   Chapter 7 bankruptcy petition.  (Hanson Decl., Pltf's SJ Ex. 138 ¶ 35, Doc. 176;

2   Walker Decl., Defs' Opp'n Ex. 11 ¶ 125, Doc. 188-8; Defs' SGI ¶ 294.)[2]  Only

3   0.7% of those customers enrolling in any program offered by Morgan Drexen

4   between October 27, 2010 and August 31, 2014, signed up for debt settlement

5   services only (Defs' SGI ¶ 133), while 4.3% of those customers enrolling in any

6   program offered by Morgan Drexen between October 27, 2010 and August 31,

7   2014, signed up for bankruptcy services only.  (Defs' SGI ¶ 138.)

8

9   For those customers signing up for both debt settlement and bankruptcy

10   services, a Chapter 7 bankruptcy petition is prepared using information received

11   from the customer, whether or not the customer decides to file for bankruptcy.

12   (Id. ¶¶ 203, 209, 212.)  Morgan Drexen and the contracting attorneys believe

13   that preparing Chapter 7 bankruptcy petitions for all clients serves a strategic

14   advantage when conducting debt settlement negotiations with creditors and can

15   result in better agreements due to the threat of bankruptcy.  (Id. ¶¶ 299, 302.)

16   The [Bureau], on the other hand, alleges that there is only anecdotal evidence

17   that the threat of bankruptcy results in greater debt reduction and better

18   settlements, and contends that Morgan Drexen is providing bankruptcy services

19   and preparing petitions simply to charge up-front fees from customers for debt

20   settlement services.  (Id. ¶¶ 300-314, 317, 327.)

21

22   (Order at 4-5, Doc. 198) (footnote in original).  In its motion for summary judgment, the

23   Bureau asserted that Defendants have unlawfully charged nearly 60,000 customers

24   improper "up-front" fees totaling $90.7 million, because little if any bankruptcy services

25   are actually performed for the customers.  In response, Defendants asserted that a Chapter

26

27

28   [2] The parties dispute the actual percentage of customers who filed for bankruptcy during this time.

1  7 bankruptcy petition is prepared using information received from the customer, whether

2  or not the customer decides to file for bankruptcy, because the preparation of the petition

3  serves as leverage in debt settlement negotiations, prevents litigation, and helps customers

4  obtain better settlement offers from creditors.  Defendants further argued that the reason so

5  few customers ultimately file for bankruptcy is that "many consumers are unwilling to pull

6  the bankruptcy trigger," "some consumers drop out of the bankruptcy process when they

7  feel they can resolve their own debts," and it is "the failure to pay fees in full that prevents

8  many bankruptcy petitions from being filed."  (Defs' Opp'n at 15-16.)

9  　　　Relying on the evidence submitted and assertions made by Defendants, the Court

10  denied both motions for summary judgment.  The Court found that the existence and use of

11  bankruptcy petitions were highly relevant to the central issue of whether Defendants'

12  business model charges up-front fees for debt settlement or bankruptcy services.  The

13  Court accepted at face value Defendants' representation that bankruptcy petitions were

14  prepared for all customers at the outset of their engagement with Defendants, whether or

15  not the customer ultimately decided to file for bankruptcy.  The Court stated that

16  "Defendants have offered some evidence suggesting that the threat of bankruptcy and

17  preparation of certain documents in connection with bankruptcy can serve a strategic

18  purpose in debt settlement negotiations.  While debt settlement and bankruptcy services

19  seem to be closely related under Morgan Drexen's business model, this does not

20  necessarily mean that the upfront fees are not specific to the bankruptcy petitions Morgan

21  Drexen and the attorneys help prepare for consumers."  (Summary Judgment Order at 12-

22  13, Doc. 198.)  As a result, the Court found that Defendants had created a genuine dispute

23  as to the legality of Morgan Drexen's business model.

24

25  **B.**     **The Bureau's Motion for Sanctions**

26  　　　On February 25, 2014, the Bureau served Morgan Drexen with a request for

27  production of documents, including a request for all documents related to a random

28  sampling of 450 consumers who were enrolled in a Morgan Drexen program between 2010

and 2014.  (O'Malley Decl. ¶ 4, Doc. 274-3.)   For months, Morgan Drexen failed to produce the requested documents and failed to comply with Court orders regarding discovery.  (O'Malley Decl. ¶¶ 3-29.)  According to Linh Tran, associate general counsel for Morgan Drexen, Defendants were ready to start producing consumer files to the Bureau in May or early June 2014.  (Transcript of February 10, 2015 hearing at 95, Docs. 278, 280.)  However, Jeffrey Katz, Morgan Drexen's general counsel, asked Tran to delay the production because supposedly there was additional information that Katz believed should be included in the files.  (Id. at 95-97.)

On June 13, 2014, the Magistrate Judge issued an order that required Defendants to produce all consumer files by June 20, 2014.  (Doc. 84.)  On June 18, 2014, Defendants requested an extension of time, providing four specific reasons for why they could not meet the deadline.  (Ex Parte App., Doc. 85.)  On August 4, 2014, the Magistrate Judge ordered Morgan Drexen to complete production of the requested documents (Order at 1-2, Doc. 115), and the Court stated that it "intends to impose monetary sanctions (which Defendants conceded are appropriate) but will withhold doing so until document production is complete."  (Id. at 3.)  Defendants eventually produced the requested documents for the random sample of consumers.  The documents that Morgan Drexen produced included bankruptcy petitions for the consumers in the sample.

On January 23, 2015, the Bureau filed the present Motion for Sanctions.  The Bureau asserts "[i]n the weeks leading up to their document production to the Bureau, Defendants manufactured bankruptcy petitions that did not previously exist."  (Reply at 1.)  Specifically, the Bureau claims that Defendants manipulated, altered, and destroyed evidence by:

> (1) creating bankruptcy petitions that did not exist at the time of the Bureau's document request and adding them to consumer files before producing files to the Bureau; (2) altering bankruptcy petitions in consumer files that did exist at the time of the Bureau's document request by inputting information into the

6

1    petitions to make it look like Morgan Drexen had performed more work on the

2    petitions than it actually had prior to the Bureau's document request; and (3)

3    altering log notes in consumer files to hide the fact that it had created and

4    altered petitions prior to producing the files to the Bureau.

5

6    (Mem. at 1, Doc. 274-1.)  The Bureau contends that Defendants' alleged actions constitute

7    fraud on the Court and "were premeditated and performed with a bad faith intent to pervert

8    justice."  (Mem. at 2.)

9

10                   **1.      The Bureau's Contentions and Evidence**

11         In support of its Motion, the Bureau submitted declarations and provided testimony

12   regarding Defendants' alleged manipulation, alteration, and destruction of evidence during

13   the discovery process.

14         First, the Bureau submitted a declaration from Joseph Calvarese, an e-law litigation

15   support specialist at the Bureau who reviewed the metadata[3] of the bankruptcy petitions

16   Morgan Drexen produced as part of their production of consumer files to the Bureau.

17   (Calvarese Decl. ¶¶ 1-12, Doc. 274-5.)   According to Calvarese, "[t]he metadata indicates

18   that Morgan Drexen created huge numbers of bankruptcy petitions *after* the Bureau

19   commenced its lawsuit and *after* Morgan Drexen received the Bureau's document

20   request."  (Id. ¶ 13 (emphasis in original).)  Calvarese asserts that 145 of the 222

21   bankruptcy petitions that he found in the 150 consumer files he reviewed were created by

22   Morgan Drexen between June 27, 2014, and July 3, 2014.  (Id. ¶¶ 8, 17; see Calvarese

23   Decl.)  126 of these 145 petitions were for consumers who were not enrolled in a Morgan

24   Drexen program during that 2014 time period.  (Calvarese Decl. ¶ 22; see, e.g., Calvarese

25

26   _____

27   [3]  Metadata provides information about an electronic document's content.  "A text document's metadata may contain information about how long the document is, who the author is, when the document was created, and a short summary of the document."  (Calvarese Decl. ¶ 4.)

28

1   Decl., Exs. 3-6.)  Only 68 of the bankruptcy petitions Morgan Drexen produced have

2   creation dates in 2011, 2012, or 2013.  (Mem. at 9.)

3        The Bureau cites numerous statements made by Morgan Drexen during this

4   litigation suggesting that all bankruptcy petitions should have been created at the time the

5   consumers were enrolled in Morgan Drexen programs.  (*See* Mem. at 10; O'Malley Decl.,

6   Exs. 15-17, Doc. 274-3; *see, e.g.,* O'Malley Decl., Ex. 15 at 10 ("Morgan Drexen

7   employees do all of the work necessary to *prepare the bankruptcy petitions at the outset of*

8   *the engagement by the clients*, so that the petitions can be sent to creditors giving the

9   attorney a credible threat of filing bankruptcy to prevent further litigation efforts by

10  creditors.") (emphasis added).)  According to the Bureau, "[f]rom the outset of this

11  litigation, Defendants have highlighted the creation of petitions as the key fact they believe

12  removes them from coverage under the" TSR.  (Reply at 3.)

13       Second, the Bureau submitted the declaration of Rita Augusta, a former member of

14  Morgan Drexen's Board of Directors and the Chief Operating Officer of Morgan Drexen

15  from in or around 2010 to November 2014.  (Augusta Decl. ¶¶ 4, 6, Doc. 274-4; Opp'n at

16  10 n. 4-5.)  In November 2014, Augusta was placed on administrative leave without pay by

17  Ledda purportedly because she expressed her concerns about Morgan Drexen and certain

18  actions the company had taken in response to the Bureau's lawsuit.[4]  (Augusta Decl. ¶ 9;

19  Augusta Decl., Ex. 1, Doc. 274-4.)

20  _____

21  [4] Defendants assert that "much of what Augusta told the Bureau is false."  (Opp'n at 11 (emphasis omitted).)  According to Defendants, "since September 25, 2014, Augusta had been angling for a

22  payoff from Morgan Drexen to buy out her equity and even hired a lawyer threatening a lawsuit against Morgan Drexen."  (Id.)  Augusta allegedly "told other employees she intended to bring

23  Morgan Drexen down, and, in December 2014 when Morgan Drexen refused to pay her off as she demanded, she apparently called the Bureau to take revenge against Morgan Drexen and

24  particularly[] Katz."  (Id.)  In essence, Defendants assert that Augusta is lying.  "In order to make determinations about the party's conduct, a court may 'make inferences and credibility

25  determinations from evidence received.'"  *The Sunrider Corp. v. Bountiful Biotech Corp.* No.

26  SACV 08-1339, 2010 WL 4589156, at *5 (C.D. Cal. Nov. 3, 2010) (quoting *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 592 (9th Cir. 1983).)  Though Defendants have attempted to refute the

27  majority of Augusta's declarations and testimony, the Court finds that, in light of the other evidence submitted to the Court, Augusta has provided the Court with credible evidence.

28

1    Augusta asserts that Katz asked her to help with document production related to this

2    case in mid-June 2014.  (Augusta Decl. ¶ 13.)  According to Augusta, Katz and another

3    Morgan Drexen employee, Nancy Jin, instructed Augusta to "(1) create bankruptcy

4    petitions for the consumer if there was no petition in the consumer's file; and (2) add

5    whatever information was available about consumers to any bankruptcy petitions that were

6    already in the files to make the petitions appear more complete."  (Id. ¶¶ 13, 15.)  Augusta

7    asserts that Katz told her that "Morgan Drexen needed petitions to appear as complete as

8    possible in order to make it seem like Morgan Drexen was actually performing

9    bankruptcy-related work for consumers enrolled in the dual program."  (Id. ¶ 13.)  Augusta

10   further contends that "Ledda was aware of the project to create and alter bankruptcy

11   petitions."  (Id. ¶ 23; *see also* Transcript of February 10, 2015 hearing at 54-55.)

12   Under Jin's supervision, Augusta assigned Morgan Drexen employees/processors to

13   complete this requested work.  (Augusta Decl. ¶¶ 16-17.)  According to Augusta, Jin

14   provided the processors with specific instructions on how to create and update the

15   bankruptcy petitions.  (Id. ¶¶ 18, 24.)  The processors allegedly were told to backdate the

16   bankruptcy petitions to make the documents look like they had been created at an earlier

17   time.  (Id. ¶ 24.)  Augusta later clarified that her use of the term "backdate" does not refer

18   to the actual dating of bankruptcy petitions, but rather refers to Defendants' use of old

19   versions of petitions to make it seem that they were created earlier than they actually were

20   created.  (Transcript of February 10, 2015 hearing at 56.)  Further, Augusta asserts that all

21   of the processors were directed to complete their work under a new, unique username,

22   which allowed Morgan Drexen to alter "the document retention system in such a way that

23   the log notes in a consumer's file did not reflect that a processor using his or her unique

24   username had created a petition or altered information in a petition already in the file."

25   (Augusta Decl. ¶ 26.)  Augusta claims that Katz directed Avi Gupta, the Chief Information

26   Officer of Morgan Drexen, to delete entries in the log notes related to the creation or

27   alteration of these bankruptcy petitions.  (Id. ¶ 27.)

28   In support of her declaration, Augusta attached spreadsheets that she used to track

9

1   the processors' work.  (Suppl. Augusta Decl., Exs. 1-3, Doc. 262-3.)  These spreadsheets

2   show that, as part of the document production, Defendants performed means tests for

3   certain customers and then included that information in the bankruptcy petitions produced

4   to the Bureau.  (Id.)  A means test is used by Morgan Drexen "to determine whether or not

5   the client fit[s] the criteria or guidelines to file for bankruptcy."  (Transcript of February

6   10, 2015 hearing at 30-31.)

7          On February 10, 2015, the Court held an evidentiary hearing regarding the Bureau's

8   Motion for Sanctions, and Augusta testified regarding the alleged events that occurred

9   during Defendants' document production to the Bureau.  (*See* Transcript of February 10,

10  2015 hearing.)  At the hearing, Augusta asserted that Katz directed her "to go through the

11  files and if there was no petition there, . . . create a petition; and if there were petitions, . . .

12  go through the file with the log notes[ and] any documents that were not processed already

13  and add any information that they could extract from that into the petition."  (Id. at 13-14.)

14  According to Augusta, Katz stated that he needed it "to appear like Morgan Drexen was

15  doing the work that . . . we stated that we were; that there needed to be work product to

16  justify the fees that were charged."  (Id. at 14.)  Augusta testified she was told by Jin that

17  "it was important for us to [begin with] the cancelled ones that had paid the highest fees,

18  because those ones needed to have the most complete bankruptcy petition done."  (Id. at

19  16.)  Not only were the processors working on the petitions directed to include information

20  from a variety of written sources, but the processors also were directed to contact active

21  clients to see if they could get more information that could be included in the bankruptcy

22  petitions.  (Id. at 20.)

23         The Bureau also questioned Augusta regarding an e-mail chain between Augusta,

24  Jin, and the two processors that Augusta had assigned to work on the document production

25  project at Morgan Drexen.  (Id. at 26-41; Augusta Decl., Ex. 2, Doc. 274-4.)  The e-mail

26  chain includes a chart that details the work that was performed on various consumer files

27  after the Bureau's document production request.  (Augusta Decl., Ex. 2.)  The chart shows

28  that considerable work, including the running of means tests with income information that

1   was provided by the customer at the outset of the engagement, was performed on customer

2   files after the Bureau's document production request.  (Id.)  Further, the e-mail chain

3   includes a response from Jin that directs the processors to select bankruptcy forms that

4   were in existence at the time of the "last cleared positive ACH," which reflects the last

5   time the customer made a payment.  (Id.)  The e-mail chain also includes a response from

6   Jin where she states, in regards to a specific customer's file, that the "means test has the

7   incorrect applicable period."  (Id.)  Additionally, on June 18, 2014, one of the processors

8   assigned to the project e-mailed Jin to inform her that means tests were being run for

9   certain customer files.  (Augusta Decl., Ex. 6, Doc. 274-4.)  Based on this e-mail chain,

10  Jin not only was aware of the means tests being run by the processors, but actually "went

11  through some of those files to determine if everything was the way that she had instructed

12  . . . [and] stated areas that needed to be reviewed by" the processors.  (Transcript of

13  February 10, 2015 hearing at 41.)

14      Based on this evidence, the Bureau requests that the Court sanction Defendants by

15  entering a default judgment against them.  (Mem. at 2.)

16

17              **2.    Defendants' Contentions and Evidence**

18      In response to the Bureau's claim that Defendants falsified evidence, Defendants

19  describe Morgan Drexen as a "virtual office" and claim that all bankruptcy petitions are

20  kept in their MDIS computer platform and Automated Bankruptcy Module ("ABM").

21  (Opp'n at 1; *see* Tran Decl. ¶¶ 12-15, Doc. 261-1; Gupta Decl. ¶¶ 3-5, Doc. 261-1.)

22  Defendants describe MDIS as a relational database that stores almost all of the information

23  relating to Morgan Drexen's attorney clients.  (Opp'n at 6.)  Despite the fact that they have

24  made statements throughout this litigation to the contrary, Defendants now claim that

25  bankruptcy petitions normally are not created unless an attorney requests that Morgan

26  Drexen generate one; until that time all of the information "remains housed in the

27  MDIS/ABM system."  (Opp'n at 21.)  Defendants further contend that, in response to the

28  Bureau's document production requests and "[t]o expedite production of documents, while

at the same time redacting consumer names, [Defendants] generated bankruptcy petitions . . . so the petitions could be redacted and all information related to a particular consumer could [be] assembled in one place in a readable form." (Id. at 7.)  According to Defendants, "the only way to extract all the information the Bureau requested from MDIS and ABM is to download the information into a bankruptcy petition." (Id. at 2.)  Defendants therefore contend that terminating sanctions are not appropriate because they did not act with the intent to falsify or manufacture evidence. (*See generally* id.)

Defendants submitted declarations and provided testimony from Morgan Drexen employees and other individuals involved with the document production that is currently at issue.

First, Defendants submitted a declaration from Katz. (Katz Decl., Doc. 26-1, Ex. B.)  Katz details the directions he purportedly provided Jin and Augusta regarding the Bureau's document production requests. (Id. ¶¶ 58-59.)  According to Katz, it was Augusta, not Jin or Katz, who attempted to backdate bankruptcy petitions. (Id. ¶ 59.)  Katz asserts that he in fact told Jin not to backdate the petitions. (Id.)  Katz maintains that "Morgan Drexen did not alter any information in the customer files and the computer data produced to the Bureau was produced intact and it is still on the database." (Id. ¶ 61 (emphasis omitted).)  However, Katz admits that he directed Jin and Augusta to "input additional data from all sources available (i.e., Best Case MDIS, unprocessed documents, oral conversations with clients of the law firm, and etc.)" for the consumer files that were produced to the Bureau. (Id. ¶ 58.)

Katz also testified at the Court's evidentiary hearing in this matter. (*See* Transcript of February 10, 2015 hearing at 157-211.)  Katz testified that he and Tran were responsible for keeping the Bureau apprised of the document production process. (Id. at 162.)  Katz explained that when the process took longer than expected, the Bureau began to forcefully demand the requested information and immediate production of the consumer files. (Id. at 162-165.)  According to Katz, the Bureau's demands concerned him and he recognized that he would need to speed up the production process. (Id. at 165-167.)  After the

1   Magistrate Judge granted the Bureau's motion to compel, Katz became "very alarmed

2   about [Defendants'] ability to" meet the 7-day deadline, and recognized that if they failed

3   to meet that deadline, Defendants could be subject to "potential significant sanctions." (Id.

4   at 166-167.)  Katz even considered "the possibility there would be terminating sanctions."

5   (Id. at 170.)

6          Katz claims that because he has been practicing law for more than 20 years, he

7   "would [not have] manufactured evidence to defraud.  [His] concern was [to] get the

8   information in a comprehensive fashion as quickly as possible and not risk sanctions."  (Id.

9   at 188.)  Yet, despite Katz's vast litigation experience, he never informed the Bureau,

10  Defendants' trial counsel, or the Court that Defendants were generating bankruptcy

11  petitions.  (Id. at 177-178.)  Even though certain documents and log notes were ready to be

12  produced to the Bureau in June 2014, and Defendants were facing potential sanctions if

13  they failed to comply with the Court's production deadlines, Katz asked Tran not to

14  produce these documents and log notes to the Bureau.  (Id. at 195-202.)  Katz claims that

15  he did not inform anyone of the creation of bankruptcy petitions because Defendants were

16  "understaffed and overwhelmed by the demands."  (Id. at 178.)

17         Second, Defendants submitted declarations from Tran and Gupta.  (Tran Decl., Doc.

18  261-1; Gupta Decl., Doc. 261-1.)  Tran refutes Augusta's assertion that any log entries

19  were "suppressed" and/or "deleted."  (Tran Decl. ¶ 40.)  Gupta also claims that "[a]t no

20  time during the course of Morgan Drexen's responding to the Bureau's document request

21  did . . . Katz[] ever request that [Gupta] suppress or delete log notes in a law firm client's

22  file."  (Gupta Decl. ¶ 6.)  Gupta asserts that, after conducting a search of the data on

23  MDIS, he has determined "that there have been no log notes suppressed or deleted."

24  (Gupta Decl. ¶ 7; Transcript of February 10, 2015 hearing at 151-152.)  According to

25  Gupta, it was Augusta, without Gupta's knowledge, who "created alias petition processor

26  users termed 'Special Project' for two users" and intended to suppress log notes.  (Gupta

27  Decl. ¶¶ 9-10; Transcript of February 10, 2015 hearing at 151; Gupta Decl., Ex. 1, Doc.

28  261-1; *see also* Bush Decl. ¶¶ 10-14, Doc. 261-1; Knox Decl. ¶¶ 8-9, Doc 261-1.)

13

Third, Defendants submitted declarations from Jin and Armidi Addessi, a certified bankruptcy petition preparer who has been employed by Morgan Drexen since December 2011.  (Jin Decl., Doc. 261-1; Addessi Decl., Doc. 261-1.)  Jin contends that she never acted outside of the scope of the instructions she received from Katz and Augusta regarding the document production requests and redaction project.  (Jin Decl. ¶ 10.)  According to Jin, it was Augusta who instructed her to backdate the bankruptcy petitions by using the "'last cleared positive ACH' . . . as the time frame in transferring the data in the Client's file from all available sources."  (Id. ¶ 13.)  Jin supports Katz's assertion that he told her that "under no circumstances should the [bankruptcy petitions] be dated with the 'last cleared positive ACH' date" and that instead the bankruptcy petitions should not be dated at all."  (Id. ¶ 14.)  Further, Addessi maintains that Jin never directed her to create bankruptcy petitions so that they could "look as good as we can" in relation to this case, that no one ever told him to alter log notes, and that Jin never directed him to pick a bankruptcy petition format that was different than the one originally used for the file.  (Addessi Decl. ¶¶ 8-11.)  However, Jin admits that processors working on the document production for the Bureau were directed "to cull the information from a variety of locations," including "the MDIS platform, documents, log entries evidencing information provided by the consumers via telephone, MDCS which contained notes of Orientation Appointments, and handwritten notes."  (Jin Decl. ¶ 12.)  Addessi also admits that he was permitted to contact consumers to secure additional information to include in the documents that would be produced to the Bureau.  (Addessi Decl. ¶ 6.)

Fourth, Defendants submitted a declaration from Ledda.  (Ledda Decl., Doc. 261-1.)  Ledda claims that he played a very limited role in Defendants' production of documents to the Bureau.  (Ledda Decl. ¶ 3.)  Yet, at the evidentiary hearing, Ledda confirmed that he knew that Morgan Drexen was creating bankruptcy petitions not in the ordinary course of business in order to produce them to the Bureau.  (February 10, 2015 hearing at 109.)  He does not refute that he had discussions with Augusta regarding the redaction and production process, but he claims that Augusta has distorted their

1   conversations in a disingenuous way.  (Ledda Decl. ¶ 8.)  Ledda also admits that

2   Defendants generated bankruptcy petitions and produced them to the Bureau with

3   information that had not yet been input into Defendants' systems.  (*See* Id. ¶ 4 ("The data

4   was scattered and housed in different systems and different formats: (1) MDIS, (2) ABM

5   Bankruptcy software, (3) Old versions of Best Case Bankruptcy software, (4) Orientation

6   Appointment logs, (5) Unprocessed Bulk Mail, (4) [sic] Partial Orientation recordings, (5)

7   [sic] other misc. sources.").)  However, Ledda maintains that his only role in the document

8   production process was assisting "with the technology issues related to the desired use of

9   an auto redaction process and the compensation for petition processors that would be

10  performing work for the legal team that would be outside of the normal course of

11  business."  (February 10, 2015 hearing at 111; id. at 112.)  Ledda "expected that [the

12  Bureau] would have been notified of these petitions as they were created outside the

13  normal course of business," but claims that he never discussed with Katz whether the

14  Bureau had been informed of the creation of the bankruptcy petitions.  (Id. at 115-116.)

15       Based on this evidence, Defendants request that the Court deny Plaintiff's Motion

16  for Sanctions.  (Opp'n.)

17

18  **III.   <u>LEGAL STANDARD</u>**

19       "There are two sources of authority under which a district court can sanction a party

20  who has despoiled evidence: [1] the inherent power of federal courts to levy sanctions in

21  response to abusive litigation practices, and [2] the availability of sanctions under [Federal

22  Rule of Civil Procedure] 37 against a party who 'fails to obey an order to provide or permit

23  discovery.'"  *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting Fed. R.

24  Civ. P. 37(b)(2)(A)).  "A court may sanction spoliation by: imposing monetary sanctions;

25  instructing the jury to draw an adverse inference against the despoiling party; excluding

26  testimony based on despoiled evidence proffered by the despoiling party; or, if willfulness

27  is found, entering default judgment against the despoiling party."  *Columbia Pictures, Inc.*

28  *v. Bunnell*, No. 2:06CV01093 FMC-JCX, 2007 WL 4877701, at *4 (C.D. Cal. Dec. 13,

2007).

First, a district court "'can sanction a party who has despoiled evidence' under its 'inherent power . . . to levy sanctions in response to abusive litigation practices.'" *Pringle v. Adams*, No. SACV 10-1656-JST RZX, 2012 WL 1103939, at *7 (C.D. Cal. Mar. 30, 2012) (quoting Leon, 464 F.3d at 958). Entry of a default judgment is permitted when the disobedient party has "willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Wyle v. R.J. Reynolds Indus.*, Inc., 709 F.2d 585, 589 (9th Cir. 1983). A terminating sanction, however, may only issue if the violation or abuse is willful, in bad faith, or the fault of the party. *Id.* "[W]illfulness, bad faith, or fault does not require wrongful intent; rather, disobedient conduct not shown to be outside the party's control is by itself sufficient to establish willfulness, bad faith, or fault." *Sanchez v. Rodriguez*, 298 F.R.D. 460, 463 (C.D. Cal. Mar. 18, 2014).

Second, Federal Rule of Civil Procedure 37 authorizes district courts to issue a "wide range of sanctions when a party fails to comply with the rules of discovery or with court orders enforcing those rules." *Wyle*, 709 F.2d at 589; Fed. R. Civ. P. 37. A district court may render a default judgment against a party that "fails to obey an order to provide or permit discovery." Fed. R. Civ. P. 37(b)(2)(A).

## IV.   DISCUSSION

### A.   Gerald Klein's Lack of Knowledge

As an initial matter, the Court notes that during the Final Pretrial Conference hearing on February 4, 2015, Defendants' lead trial counsel, Gerald Klein, asserted that he had no knowledge of Defendants' creation of bankruptcy petitions prior to the filing of the Bureau's Motion for Sanctions. (Transcript of February 4, 2015 hearing at 9-11, Doc. 271.) Based on the evidence submitted to the Court and Klein's statements under penalty of perjury, the Court is convinced that Klein did not have any knowledge of Defendants' falsification of evidence. (*See also* Transcript of February 4, 2015 hearing at 16, where the Bureau's counsel states that "Klein has represented to the Court that he was unaware of this

1    situation, and we take him at his word.").)

2       Accordingly, the Court finds that Klein should not be held accountable for the

3    actions of his clients.

4

5         **B.**     <u>**Morgan Drexen's Willfulness, Bad Faith, and Fault**</u>

6       It is well settled that the entry of default judgment is warranted when "a party has

7    engaged deliberately in deceptive practices that undermine the integrity of judicial

8    proceedings." *Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348

9    (9th Cir. 1995); *see also Phoeceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc.*, 682 F.2d

10    802, 806 (9th Cir. 1982) ("It is firmly established that the courts have inherent power to

11    dismiss an action or enter a default judgment to ensure the orderly administration of justice

12    and the integrity of their orders.").  It is now clear to the Court that Defendants do not

13    create bankruptcy petitions in the normal course of business.  The evidence shows that

14    Defendants not only acted willfully and in bad faith by falsifying evidence, but also

15    decided to continuously deceive their own trial counsel, opposing counsel, and the Court

16    by engaging in practices that have undermined the integrity of judicial proceedings.

17       In its order denying summary judgment, the Court relied on Defendants' assertions

18    that Chapter 7 bankruptcy petitions were prepared for all clients at the outset of their

19    engagement with Morgan Drexen, whether or not the customer ultimately decides to file

20    for bankruptcy.  (Order at 4-5; Defs' SGI ¶¶ 203, 209, 212; Defs' Opp'n at 7-8, 18; Klein

21    Decl., Doc. 188-23; Rugeti Decl., Doc. 188-22.)  The Court explicitly relied on the fact

22    that Defendants "offered some evidence suggesting that the threat of bankruptcy and

23    *preparation* of certain documents in connection with bankruptcy can serve a strategic

24    purpose in debt settlement negotiations," and found that a genuine dispute of material fact

25    existed as to whether the upfront fees charged by Defendants were "specific to the

26    bankruptcy petitions Morgan Drexen and the attorneys help *prepare* for consumers."

27    (Order at 12-13 (emphasis added).)  However, now, only after Defendants' prior

28    statements have been shown to be false, Defendants claim that bankruptcy petitions

UST Exhibit 9 - Page 17 of 28

1  normally are not created unless an attorney requests that Morgan Drexen generate one;

2  until that time all of the information "remains housed in the MDIS/ABM system."  (Opp'n

3  at 21.)  The fact that Defendants now claim for the first time that bankruptcy petitions are

4  not actually prepared for clients at the outset of their engagement with Defendants strongly

5  suggests that Defendants have deceived the Court in a way that not only undermined the

6  Court's previous order denying summary judgment, but also now threatens the integrity of

7  trial.

8         Though the Court finds Augusta's declarations and testimony credible, even if the

9  Court were to ignore her allegations, the evidence overwhelmingly reflects that Defendants

10  acted willfully and in bad faith by falsifying evidence during the discovery process.

11        First, Defendants admit that they were ready to start producing consumer files to the

12  Bureau in May or early June 2014.  (Transcript of February 10, 2015 hearing at 95, Docs.

13  278, 280.)  However, Katz asked Tran to delay the production because there was additional

14  information that Katz wanted to include in the files.  (Id. at 95-97.)  Katz testified that,

15  even though certain documents and log notes were ready to be produced to the Bureau in

16  June 2014, and Defendants were facing potential sanctions if they failed to comply with

17  the Court's production deadlines, Katz asked Tran not to produce these documents and log

18  notes to the Bureau.  (Id. at 195-202.)  Defendants have failed to explain why, even though

19  a large portion of the requested discovery could have been produced to the Bureau,

20  Defendants chose to risk litigation sanctions by delaying production.  Absent any

21  explanation by Defendants, the logical explanation is that Morgan Drexen delayed

22  production in order to create hundreds of new bankruptcy petitions to produce to the

23  Bureau because they knew the absence of such petitions would raise serious red flags.

24  (*See generally* Calvarese Decl.)

25        Second, Defendants' decision to produce the requested discovery in the form of

26  bankruptcy petitions strongly suggests an intent to deceive the Court and opposing

27  counsel.  Defendants contend that "not only is the bankruptcy petition the simplest and

28  most efficient method to extract data from ABM, but it is the only method to extract data

18

from ABM."  (Tran Decl. ¶ 25 (emphasis omitted).)  However, at the evidentiary hearing, Defendants admitted that the requested customer information could have been produced as raw data, and log notes could have been produced in a form other than bankruptcy petitions (e.g. as a .csv file).  (Transcript of February 10, 2015 hearing at 153-154.) Further, Defendants specifically chose to use old versions of bankruptcy petitions that coincided with the last payment that the customer had made to Morgan Drexen, rather than current versions of the bankruptcy petitions.  (Id. at 56; Jin Decl. ¶ 13.)  Defendants have not provided a convincing reason for why they would decide to use old versions of bankruptcy petitions if the only goal was to produce the requested information to the Bureau in a single and convenient format.  Once again, Defendants' actions strongly suggest that they were engaging in behavior intended to mislead the Court and the Bureau by attempting to pass off bankruptcy petitions as if they had been created in the normal course of business.

Third, Defendants admit that the processors assigned to work on the document production project for the Bureau were directed "to cull the information from a variety of locations," including "the MDIS platform, documents, log entries evidencing information provided by the consumers via telephone, MDCS which contained notes of Orientation Appointments, and handwritten notes."  (Jin Decl. ¶ 12.)  Jin and Augusta were directed to "input additional data from all sources available (i.e., Best Case MDIS, unprocessed documents, oral conversations with clients of the law firm, and etc." for the consumer files that were produced to the Bureau.  (Katz Decl. ¶ 58; *see also* Ledda Decl. ¶ 4.)  Processors working on the petitions also were directed to contact active clients to see if they could get more information that could be included in the bankruptcy petitions.  (Addessi Decl. ¶ 6.) Defendants thus gathered information from a variety of sources and input data into bankruptcy petitions that did not exist prior to the Bureau's document production request. The only logical conclusion is that Defendants were attempting to make it seem that more substantive bankruptcy work had been performed on customer files to support Defendants' charging of upfront fees.

1    Fourth, Defendants ran means tests for certain customers and included that

2    information in the bankruptcy petitions produced to the Bureau.  (Suppl. Augusta Decl.,

3    Exs. 1-3.)  Defendants have failed to provide an explanation for why means tests needed to

4    be run on consumer files after the Bureau's document production request.  Once again, the

5    only logical conclusion is that Defendants were attempting to make it seem that more

6    substantive and complete bankruptcy work had been performed on certain consumer files

7    before producing the files to the Bureau.  And while Defendants claim that Augusta was

8    the person who directed the processors to perform these means tests, the evidence

9    submitted to the Court proves that Defendants not only knew that means tests were being

10   performed, but that Jin actually "went through some of those files to determine if

11   everything was the way that she had instructed . . . [and] stated areas that needed to be

12   reviewed by" the processors.  (Transcript of February 10, 2015 hearing at 41.)  Even if it

13   were true that Jin conducted only one means test on a customer file herself (*see* id. at 121),

14   the e-mails between Augusta, Jin, and the processors reveal that Defendants were aware

15   and actively involved in the running of means tests.

16       Fifth, and maybe most damning to Defendants' case, Defendants had numerous

17   opportunities to inform the Court, opposing counsel, or its own trial counsel of the creation

18   of new bankruptcy petitions.  However, they continually failed to do so.

19       On June 13, 2014, the Magistrate Judge issued an order that required Defendants to

20   produce all consumer files by June 20, 2014.  (Doc. 84.)  On June 18, 2014, Defendants

21   requested an extension of the deadline, providing four specific reasons for why they could

22   not meet the deadline (Ex Parte App., Doc. 85.)  Yet, Defendants never informed the Court

23   that at least part of the reason for the delay was the fact that Defendants were creating

24   bankruptcy petitions to produce to the Bureau.

25       Further, in opposition to the Bureau's subsequent motion for litigation sanctions,

26   Defendants submitted a declaration from Tran which provided several reasons why

27   Defendants were unable to meet their productions deadlines.  (Opp'n, Doc. 100; Tran

28   Decl., Dec. 100-3; *see also* Transcript of February 10, 2015 hearing at 100-102.)  Though

20

1  Tran delineated five specific reasons why Defendants could not comply with the Court's

2  production deadlines, Defendants once again failed to inform the Court that Defendants

3  were creating hundreds of new bankruptcy petitions to produce to the Bureau. (*See*

4  Calvarese Decl. ¶¶ 8, 17; Calvarese Decl., Ex. 1, Doc. 274-5 (showing that of the 222

5  bankruptcy petitions that Calvarese found in the 150 consumer files he reviewed, 145 were

6  created by Morgan Drexen between June 27, 2014, and July 3, 2014, and 126 of these 145

7  petitions were for consumers who were not enrolled in a Morgan Drexen program during

8  that 2014 time period).)

9      Additionally, Katz testified that, after the Magistrate Judge granted the Bureau's

10  motion to compel, he became "very alarmed about [Defendants'] ability to" meet the 7-day

11  deadline, and recognized that if they failed to meet that deadline Defendants could be

12  subject to "potential significant sanctions." (Transcript of February 10, 2015 hearing at

13  166-167.)  He even considered "the possibility there would be terminating sanctions." (Id.

14  at 170.)  Nevertheless, once again, Katz chose not to inform the Bureau, Defendants' trial

15  counsel, or the Court that part of the reason for the delay was that Defendants were

16  generating bankruptcy petitions. (Id. 177-178.)  Defendants chose to risk sanctions, and

17  potentially terminating sanctions, rather than inform the Court that new bankruptcy

18  petitions were being created for production.

19      During the discovery process, Defendants also deposed one of the Bureau's experts,

20  Katherine Porter, who provided testimony related to the bankruptcy petitions produced by

21  Defendants in response to the Bureau's request.  Even though Katz was present at this

22  deposition, and Porter's testimony opined specifically on many of the newly created

23  bankruptcy petitions, Katz never informed the Bureau or Defendants' trial counsel that the

24  petitions were not created in the ordinary course of business. (Id. at 208-209.)

25      Finally, even after the Court issued its order denying summary judgment, in which

26  the Court clearly relied on Defendants' misleading assertions regarding the preparation and

27  creation of bankruptcy petitions that purportedly occurred in the ordinary course of

28  business, Katz never informed the Court, the Bureau, or Defendant's trial counsel that new

1  bankruptcy petitions had been created and then produced to the Bureau.  (Id. at 210-211.)

2      "A party's destruction of evidence qualifies as willful spoliation if the party has

3  some notice that the documents were potentially relevant to the litigation before they were

4  destroyed."  *Leon*, 464 F.3d at 959 (internal quotation marks and citation omitted).

5  Further, "[t]he duty to preserve documents attaches when a party should have known that

6  the evidence may be relevant to future litigation."  *Pringle*, 2012 WL 1103939, at *7

7  (quoting *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1068 (N.D. Cal.

8  2006)).  Not only may bad faith destruction of evidence result in the issuance of

9  terminating sanctions, but the manufacturing or alteration of evidence may warrant the

10  issuance of a default judgment as well.  *See PersonalWeb Technologies, LLC v. Google

11  Inc.*, No. C13-01317-EJD (HRL), 2014 WL 580290, at *2 (N.D. Cal. Feb. 13, 2014).

12  After holding an evidentiary hearing and reviewing the evidence submitted against

13  Defendants, the Court now is convinced that Defendants willfully and in bad faith engaged

14  in a coordinated and extensive effort to deceive the Court and opposing counsel.

15  Defendants blatantly falsified evidence and then concealed this fact from the Court,

16  opposing counsel, and even their own counsel at every turn.  Accordingly, the Court finds

17  that Defendants' conduct was "utterly inconsistent with the orderly administration of

18  justice."  *Wyle*, 709 F.2d at 589.

19

20      **C.**     **Factors Relevant to the Imposition of a Terminating Sanction**

21      Nevertheless, under either Rule 37 or the district court's inherent power, "[b]efore

22  imposing the harsh sanction of dismissal [or default judgment], the district court must

23  weigh several factors: (1) the public's interest in expeditious resolution of litigation; (2)

24  the court's need to manage its dockets; (3) the risk of prejudice to the party seeking

25  sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the

26  availability of less drastic sanctions."  *Anheuser-Busch*, 69 F.3d at 348 (citation omitted).

27

28

1    **1.    The Public's Interest in Expeditious Resolution of Litigation**

2    This factor always favors imposing sanctions. *Sunrider*, 2010 WL 4589156, at *6.

3    The granting of a default judgment is appropriate when a party's conduct causes

4    considerable delays in a case, such as when a court needs to continue trial, a plaintiff is

5    forced to file discovery motions after the discovery cut-off date, or the filing of multiple

6    sanctions motions frustrates a court's and the parties' ability to resolve the litigation. *Id.*

7    Here, because of Defendants' deceitful conduct during the discovery process and

8    throughout this litigation, the Court has had to delay trial and hold an evidentiary hearing.

9    Further, the Bureau has been forced to file numerous discovery motions, motions to

10   compel, and motions for sanctions.  As a result, the Court finds that Defendants' conduct

11   has caused considerable delays in this case and has threatened Plaintiff's and the Court's

12   ability to resolve the litigation.

13   Accordingly, the Court finds that this factor weighs in favor of the entry of default

14   judgment against Defendants.

15

16   **2.    The Court's Need to Manage its Docket**

17   This factor also almost always weighs in favor of granting a default judgment.

18   *Sunrider*, 2010 WL 4589156, at *6.  If a party poses unnecessary hurdles in the resolution

19   of the action, consumes more than his share of judicial time and resources, and affects a

20   court's ability to manage its other cases, entering default judgment may be warranted. *Id.*

21   Defendants' falsification of evidence and deceitful conduct throughout the discovery

22   process have created considerable hurdles to the resolution of this action.  The Magistrate

23   Judge and this Court have had to decide numerous discovery and sanctions motions, delay

24   trial, and hold an evidentiary hearing because of Defendants' wrongdoing.  As a result,

25   Defendants have consumed more than their fair share of judicial time and resources and

26   threatened the Court's ability to manage its docket.

27   Accordingly, this factor weighs in favor of terminating sanctions.

28

### 3.     <u>The Risk of Prejudice to the Party Seeking Sanctions</u>

"The prejudice inquiry looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case."  *Leon*, 464 F.3d at 959 (alterations in original) (internal quotation marks and citation omitted).  "For the Court to impose the sanction of default, it must find that there is a nexus between the Defendants' misconduct and the merits of the case."  *Columbia Pictures*, 2007 WL 4877701, at *6.  A party suffers prejudice when it is led to rely on incomplete information or spotty evidence or when the opposing party willfully thwarts the discovery process.  *Pringle*, 2012 WL 1103939, at *9; *Sunrider*, 2010 WL 4589156, at *8.  "Whether or not the documents would have changed the outcome of the trial is not the issue in determining prejudice."  *Anheuser-Busch*, 69 F.3d at 354.  Moreover, "it is appropriate to presume that where documents relevant to the merits of the litigation have been concealed the deception casts doubt on the concealing party's case."  *Id.*

Defendants contend that the Bureau has not suffered any prejudice because "no evidence was destroyed.  Nothing was lost.  We're going to trial on the same basic issues."  (Transcript of February 4, 2015 hearing at 11.)  However, not only has the Court relied on Defendants' misrepresentations and falsified evidence, but the Bureau also has suffered prejudice as a result of Defendants' wrongdoing.  From the outset of this litigation, Defendants have argued that they are entitled to charge upfront fees because of the considerable bankruptcy work performed for clients.  (*See, e.g.,* O'Malley Decl., Ex. 15 at 10.)  As discussed above, the Court has determined that the existence and use of bankruptcy petitions is highly relevant to the central issue of whether Defendants' business model charges up-front fees for debt settlement or bankruptcy services.  The number of bankruptcy petitions that Defendants prepared and created for clients relates directly to the amount of substantive bankruptcy work Defendants actually performed for its customers.  As a result, the creation and number of bankruptcy petitions is at the heart of the defense in this case.

1    Therefore, there is no question that Defendants' falsification of evidence threatened

2  to distort the resolution of the case by forcing the Bureau to rely on fabricated and

3  manufactured evidence.  Here, Defendants destroyed the snapshot of what the petitions

4  would have actually looked like had they simply been produced in the ordinary course of

5  business.  The Bureau has been misled and prejudiced throughout the discovery process,

6  when preparing its experts for depositions, in arguing for and against summary judgment,

7  and during its preparation for trial.  The Bureau asserts that it "has wasted considerable

8  time (deposition and trial preparation) and incurred significant expense (retention of expert

9  Katherine Porter) responding to Defendants' canard that they actually perform bankruptcy

10  work on bankruptcy petitions and present those bankruptcy petitions to third parties."

11  (Reply at 8.)  The Court agrees, and thus finds that Defendants' falsification and alteration

12  of evidence has prejudiced the Bureau.  Even if this prejudice could be "mitigated

13  somewhat by [the Bureau's] success in locating some relevant evidence despite

14  Defendants' misconduct, this factor nonetheless weighs strongly in favor of terminating

15  sanctions."  *Columbia Pictures*, 2007 WL 4877701, at *7.

16    Accordingly, the Court finds that this factor weighs in favor of an entry of default

17  judgment against Defendants.

18

19       **4.     The Public Policy Favoring Disposition on the Merits**

20    This factor almost always weighs against dismissal.  *See Sunrider*, 2010 WL

21  4589156, at *8 ("This factor by its very title falls against the imposition of terminating

22  sanctions").  Defendants already have undermined the integrity of the Court's summary

23  judgment order.  And the Court recognizes that the issuance of terminating sanctions prior

24  to trial would prevent the Court from disposing of this case on the merits.  However, here,

25  the ability to reach a merits determination has already been compromised by the

26  falsification of evidence.

27    Accordingly, the Court finds that this factor weighs only slightly against

28  terminating sanctions.  Thus, this factor "is insufficient to outweigh the other four factors."

1 | *Pringle*, 2012 WL 1103939, at *10.

2

3 | ### 5.   The Availability of Less Drastic Sanctions

4 | "The Court may dismiss the case based on spoliation of evidence where (1) less

5 | drastic sanctions would be inappropriate, (2) the Court implemented alternative sanctions

6 | before ordering dismissal, and (3) the Court warned the party of dismissal before ordering

7 | dismissal." *Id.* (citing *Leon*, 464 F.3d at 960).

8 | As to the first criterion, imposition of a lesser sanction is not appropriate if it would

9 | reward a defendant for its misconduct. *Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593

10 | F. Supp. 1443, 1456 (C.D. Cal. 1984).  Further, lesser sanctions, such as the exclusion of

11 | evidence or a jury instruction creating an evidentiary presumption, are insufficient if they

12 | would be futile. *Leon*, 464 F.3d at 960.  Here, the Court cannot issue a jury instruction as a

13 | lesser sanction because Defendants waived their right to a jury trial.  (Stipulation, Doc.

14 | 219.)  Additionally, Defendants have called into question the authenticity of any

15 | bankruptcy work they claim they have performed for customers.  The central issue of this

16 | case is whether Defendants provide bankruptcy services that warrant charging up-front

17 | fees.  As a result, a lesser sanction excluding evidence would require the Court to exclude

18 | all evidence of bankruptcy services performed by Defendants, a ruling that would be an

19 | effective dismissal.  Finally, "[i]t is appropriate to reject lesser sanctions where the court

20 | anticipates continued deceptive misconduct." *Anheuser-Busch*, 69 F.3d at 352.  Based on

21 | the extent of Defendants' misrepresentation and falsification of evidence, the Court

22 | anticipates that Defendants would continue to deceive the Court, its own trial counsel, and

23 | opposing counsel if the Court allowed this case to proceed to trial.  Thus, the first criterion

24 | under this factor weighs in favor of entering default judgment.

25 | The second and third criteria are inapplicable when "the destruction of the evidence

26 | occurred before the court had any opportunity to warn" the disobedient party. *Leon*, 464

27 | F.3d at 960; *Pringle*, 2012 WL 1103939, at *10.  "[A]n explicit warning is not always

28 | necessary." *Anheuser-Busch*, 69 F.3d at 353 (citation and quotation marks omitted).

1   Nevertheless, Defendants admitted that they were aware that terminating sanctions could

2   be issued against Defendants if they continued to violate Court orders.  (Transcript of

3   February 10, 2015 hearing at 170.)  The Magistrate Judge also explicitly stated that he

4   would be issuing monetary sanctions after document production was complete.  (Order at

5   3, Doc. 115.)  Thus, the Court finds that the second and third criteria under this factor also

6   weigh in favor of entering default judgment against Defendants.

7          Although termination of a case is a harsh sanction appropriate only in

8   "extraordinary circumstances," *Halaco Eng'g Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.

9   1988), the circumstances in this case warrant the entry of default judgment against

10  Defendants.  "Lesser sanctions would not be adequate to punish the [D]efendants for the

11  wrongful conduct and ameliorate the prejudice and harm to the [Bureau]." *Columbia*

12  *Pictures*, 2007 WL 4877701, at * 8.

13         Accordingly, the Court GRANTS the Bureau's Motion for Sanctions and enters

14  default judgment against Morgan Drexen.

15

16         **D.     Personal Liability of Walter Ledda**

17         At the evidentiary hearing, Ledda confirmed that he knew that Morgan Drexen was

18  creating bankruptcy petitions not in the ordinary course of business in order to produce

19  them to the Bureau.  (February 10, 2015 hearing at 109.)  Yet, Ledda maintained that his

20  only role in the document production process was assisting "with the technology issues

21  related to the desired use of an auto redaction process and the compensation for petition

22  processors that would be performing work for the legal team that would be outside of the

23  normal course of business." (Id. at 111; id. at 112.)  Ledda contends that he "expected that

24  [the Bureau] would have been notified of these petitions as they were created outside the

25  normal course of business," but claims that he never discussed with Katz whether the

26  Bureau had been informed of the creation of the bankruptcy petitions.  (Id. at 115-116.)

27         The Court finds that the briefing, supporting documentation, and evidence

28  submitted by the parties is insufficient for the Court to determine whether Ledda should be

1    held personally liable for Morgan Drexen's wrongful conduct at this time.  Accordingly,

2    the Court orders that the parties provide supplemental briefing regarding the personal

3    liability of Ledda and whether default judgment should be entered against him as well.

4

5    **V.      <u>CONCLUSION</u>**

6            For the foregoing reasons, the Court GRANTS the Bureau's Motion for Sanctions

7    as to Defendant Morgan Drexen Inc.  (Docs. 255-2, 274.)  Pursuant to this Order, all other

8    pending motions are DENIED as moot.  (Docs. 248, 250.)

9            The Court ORDERS supplemental briefing regarding the personal liability of

10   Defendant Walter Ledda and whether the Court should enter default judgment against him

11   as well.  The Bureau shall file a supplemental brief no later than **May 1, 2015**.  Defendants

12   may respond to the Bureau's supplemental brief no later than **May 15, 2015**.  Any reply is

13   due no later than **May 22, 2015**.

14

15

16

17   DATED: April 21, 2015

18                                          JOSEPHINE L. STATON
                                            UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28

# Exhibit 10

 **usbank**

P O Box 1800
Sain Paul Minneso a 55101-0800

8823       TRN                                    Y       ST01



### Business Statement

Account Number:
██████1790
Statement Per od:
Feb 2, 2015
through
Feb 28, 2015

Page 1 of 1

```
ıljılljılljıllıjılljılljıljıljıljıljıljıljıljılljılljılljılljıljlllllljjlj
000011914 1 AV 0.381 10648194 5015953 P
LAW OFF CES OF ER K GRAEFF  P C  OLTA
LAWYERS TRUST ACCOUNT
MORGAN DREXEN ACCTG SUPPORT SERV CES
675 ANTON BLVD
COSTA MESA CA 92626 7011
```

☎                                    **To Contact U.S. Bank**

**Commercial Customer
Service:**                            1-866-642-8143

**Telecommunications Device
for the Deaf:**                       1-800-685-5065

**Internet:**                         usbank com

## INFORMATION YOU SHOULD KNOW

Effect ve March 1, 2015, we w   no onger offer Amer can Express Trave ers Cheques at our branch ocat ons.

## LAWYERS TRUST                                            *Member FDIC*
U.S. Bank National Association                  **Account Number** ██████-1790

### Account Summary

|  | # Items |  |  |  |  |  |
|---|---|---|---|---|---|---|
| Beg nn ng Ba ance on Feb 2 |  | $ | 53,607.45 | Interest Pa d th s Year | $ | 9.08 |
| Other Depos ts | 9 |  | 5,570.52 | Number of Days n Statement Per od |  | 28 |
| Other W thdrawa s | 8 |  | 59,177.97 - |  |  |  |
| **Ending Balance on Feb 28, 2015** |  | **$** | **0.00** |  |  |  |

### Other Deposits

| Date | Description of Transaction |  |  | Ref Number |  | Amount |
|---|---|---|---|---|---|---|
| Feb 2 | E ectron c Funds Transfer | From Accoun ██████ 1774 |  |  | $ | 507.00 |
| Feb 3 | Electronic Funds Transfer | From Accoun ██████ 1774 |  |  |  | 732.00 |
| Feb 4 | E ectron c Funds Transfer | From Accoun ██████ 1774 |  |  |  | 1,034.02 |
| Feb 5 | Electronic Funds Transfer | From Account ██████ 1774 |  |  |  | 1,149.00 |
| Feb 9 | E ectron c Funds Transfer | From Account ██████ 1774 |  |  |  | 548.18 |
| Feb 10 | Electronic Funds Transfer | From Account ██████ 774 |  |  |  | 470.82 |
| Feb 12 | E ectron c Funds Transfer | From Account ██████ 774 |  |  |  | 29.00 |
| Feb 20 | Electronic Funds Transfer | From Account ██████ 774 |  |  |  | 1,097.00 |
| Feb 27 | Interest Pa d |  |  | 2700004122 |  | 3.50 |
|  |  |  | **Total Other Deposits** |  | **$** | **5,570.52** |

### Other Withdrawals

| Date | Description of Transaction |  |  | Ref Number |  | Amount |
|---|---|---|---|---|---|---|
| Feb 6 | E ectron c Funds Transfer | To Account ██████ 1782 |  |  | $ | 556.62- |
| Feb 13 | Electronic Funds Transfer | To Account ██████ 1782 |  |  |  | 620.46- |
| Feb 17 | Electronic Funds Transfer | To Account ██████ 1782 |  |  |  | 962.36- |
| Feb 18 | Electronic Funds Transfer | To Account ██████ 1782 |  |  |  | 1,128.38- |
| Feb 19 | Electronic Funds Transfer | To Account ██████ 1782 |  |  |  | 3,086.99- |
| Feb 20 | Electronic Funds Transfer | To Account ██████ 0283 |  |  |  | 52,644.66- |
| Feb 23 | E ectron c Funds Transfer | To Account ██████ 0283 |  |  |  | 175.00- |
| Feb 27 | LTAB Net Income Payable |  |  | 2700004123 |  | 3.50- |
|  |  |  | **Total Other Withdrawals** |  | **$** | **59,177.97-** |

### Balance Summary

| Date | Ending Balance | Date | Ending Balance | Date | Ending Balance |
|---|---|---|---|---|---|
| Feb 2 | 54,114.45 | Feb 9 | 57,021.03 | Feb 18 | 54,809.65 |
| Feb 3 | 54,846.45 | Feb 10 | 57,491.85 | Feb 19 | 51,722.66 |
| Feb 4 | 55,880.47 | Feb 12 | 57,520.85 | Feb 20 | 175.00 |
| Feb 5 | 57,029.47 | Feb 13 | 56,900.39 | Feb 23 | 0.00 |
| Feb 6 | 56,472.85 | Feb 17 | 55,938.03 | Feb 27 | 0.00 |

Ba ances on y appear for days ref ect ng change.



USB 0347

UST Exhibit 10 - Page 1 of 1

Case 16-03013-rld    Doc 48-1    Filed 11/04/16

# Exhibit 11



# Business Statement

Account Number:
■ 0283

**us bank.**

P O Box 1800
Saint Paul Minnesota 55101-0800

8823      TRN                          Y      ST01

Statement Per od:
Feb 2, 2015
through
Feb 28, 2015

Page 1 of 2

000011805 1 AV 0.381 106481945015844 P
HOWARD LAW PC   OLTA
LAWYERS TRUST ACCOUNT CA
675 ANTON BLVD
COSTA MESA CA 92626 7011

☎                                    **To Contact U.S. Bank**

**Commercial Customer**
**Service:**                          *1-866-642-8143*

**Telecommunications Device**
**for the Deaf:**                     *1-800-685-5065*
**Internet:**                          *usbank com*

## INFORMATION YOU SHOULD KNOW

Effect ve March 1, 2015, we w  no onger offer Amer can Express Trave ers Cheques at our branch ocat ons.

## LAWYERS TRUST                                                    *Member FDIC*

U.S. Bank National Association                        Account Number■■■■0283

### Account Summary

|  | # Items |  |  |  |  |
|---|---|---|---|---|---|
| Beg nn ng Ba ance on Feb 2 |  | $ | 1,101,876.80 | Interest Pa d th s Year | $ | 244.29 |
| Other Depos ts | 17 |  | 141,775.81 | Number of Days n Statement Per od |  | 28 |
| Other W thdrawa s | 20 |  | 161,679.89 - |  |  |  |
| **Ending Balance on Feb 28, 2015** | | **$** | **1,081,972.72** | | | |

### Other Deposits

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Feb 3 | E ectron c Funds Transfer | From Account ■887 | | $ | 3,113.45 |
| Feb 4 | Electron c Funds Transfer | From Account ■616 | | 2,118.20 |
| Feb 4 | E ectron c Funds Transfer | From Account ■887 | | 17,469.05 |
| Feb 5 | E ectron c Funds Transfer | From Account ■616 | | 361.76 |
| Feb 5 | Electron c Funds Transfer | From Account ■887 | | 17,408.05 |
| Feb 9 | E ectron c Funds Transfer | From Account ■887 | | 4,188.11 |
| Feb 10 | Electron c Funds Transfer | From Account ■887 | | 5,107.96 |
| Feb 11 | Electron c Funds Transfer | From Account ■616 | | 910.11 |
| Feb 12 | Electron c Funds Transfer | From Account ■887 | | 2,251.77 |
| Feb 17 | Electron c Funds Transfer | From Account ■616 | | 452.99 |
| Feb 19 | Electron c Funds Transfer | From Account ■616 | | 3,260.81 |
| Feb 19 | Electron c Funds Transfer | From Account ■887 | | 27,682.15 |
| Feb 20 | Electron c Funds Transfer | From Account ■887 | | 311.14 |
| Feb 20 | Electron c Funds Transfer | From Account ■790 | | 52,644.66 |
| Feb 23 | Electron c Funds Transfer | From Account ■790 | | 175.00 |
| Feb 25 | Electron c Funds Transfer | From Account ■887 | | 4,190.93 |
| Feb 27 | Interest Pa d | | 2700001414 | 129.67 |
| | | **Total Other Deposits** | **$** | **141,775.81** |

### Other Withdrawals

| Date | Description of Transaction | | Ref Number | Amount |
|---|---|---|---|---|
| Feb 2 | E ectron c Funds Transfer | To Account ■9624 | | $ | 1,288.75- |
| Feb 2 | E ectron c Funds Transfer | To Account ■0275 | | 6,871.72- |
| Feb 6 | E ectron c Funds Transfer | To Account ■9624 | | 1,442.71- |
| Feb 6 | E ectron c Funds Transfer | To Account ■0275 | | 7,270.11- |
| Feb 9 | E ectron c Funds Transfer | To Account ■9624 | | 969.82- |
| Feb 10 | E ectron c Funds Transfer | To Account ■9624 | | 2,000.64- |
| Feb 12 | E ectron c Funds Transfer | To Account ■9624 | | 626.51- |
| Feb 13 | E ectron c Funds Transfer | To Account ■9624 | | 1,460.76- |
| Feb 13 | E ectron c Funds Transfer | To Account ■0275 | | 7,538.13- |
| Feb 17 | E ectron c Funds Transfer | To Account ■0275 | | 1,816.81- |
| Feb 17 | E ectron c Funds Transfer | To Account ■0275 | | 18,943.67- |

USB 0855

# Exhibit 12

| | |
|---|---|
| **From:** | McClurg, Carla  (USTP) |
| **Sent:** | Thursday, October 27, 2016 12:49 PM |
| **To:** | jeffrey.katz@kesherlawgroup.com; nhenderson@portlaw.com |
| **Cc:** | (lscott@scott-law-group.com); Timothy A. Solomon (tsolomon@llg-llc.com) |
| **Subject:** | UST v. Howard et al. - responsive documents requested from the Howard defendants |
| **Attachments:** | HOW 0116-131 Stites response to production.pdf; CFPB v MD Doc 356-1 Howard declaration filed 8-26-15.pdf |

Dear Messrs. Katz and Henderson,

Based on the testimony of Mr. Katz and Mr. Walker and the Declaration of Vincent Howard (attached), we understand that Mr. Howard has access to accounting and client information/data from both the MDIS and MAS 500 systems that were maintained by Morgan Drexen for Howard Law.  Mr. Howard's testimony regarding his access to records during his deposition was not accurate or complete although I was clear that we were evaluating if a motion to compel production was appropriate and needed to know if he had responsive documents.  We believe that Mr. Howard has information and records responsive to nearly all of the attached requests for production that he has not produced.

We request that you produce documents responsive to at least the United States Trustee's request numbers 11, 12, and 13 promptly.  The testimony yesterday highlighted some data and documents that are responsive to those requests, including but not limited to: log notes for the transferred clients, accounting records, client account reconciliations, receivables and payables aging reports, balance sheets, and check ledgers. We may move to compel production if you do not timely provide documents responsive to numbers 11, 12, and 13.

We believe Mr. Howard also has documents responsive to additional requests.  Mr. Howard is required to supplement and provide responses as to all of the requests, and we are not excusing Mr. Howard from his obligations to respond to discovery requests in good faith and supplement his discovery responses.

Please advise no later than COB on Monday, October 31, whether your client will produce the withheld documents and data, and, if so, what documents and data will be provided and when.  Any privilege concerns should be addressed by providing those documents to Mr. Scott to evaluate privilege concerns for Mr. Graeff's clients.  If you do not timely and satisfactorily respond to this email, we intend to file a motion to compel and for sanctions, which will not be limited to request numbers 11, 12, and 13.  Thank you.


**Carla Gowen McClurg**
Trial Attorney
U.S. Department of Justice
Office of the United States Trustee
620 SW Main Street, Suite 213
Portland, OR 97205
(503) 326-7659

This message and any attachments are intended only for addressee and may contain information that is privileged, "Limited Official Use," or "Sensitive But Unclassified."  If the reader of the message is not the intended recipient, then any dissemination of this communication is strictly prohibited.  If you have received this communication in error, please

notify us immediately by replying to this e-mail message or by telephone at the number above, and delete the message and any attachments from your system.  Thank you.

# Exhibit 13

| Client # | Trust balance as of transfer |
|---|---|
| ███████ | 944.20 |
| ███████ | 245.00 |
| ███████ | 50.00 |
| ███████ | 2,306.09 |
| ███████ | 1,124.16 |
| ███████ | 713.48 |
| ███████ | 742.66 |
| ███████ | 421.25 |
| ███████ | 3,949.26 |
| ███████ | 669.39 |
| ███████ | 2,861.14 |
| ███████ | 550.50 |
| ███████ | 256.02 |
| ███████ | 1,719.26 |
| ███████ | 930.28 |
| ███████ | 2,298.02 |
| ███████ | 1,274.69 |
| ███████ | 3,743.00 |
| ███████ | 3,774.07 |
| ███████ | 2,170.25 |
| ███████ | 2,061.62 |
| ███████ | 403.61 |
| ███████ | 2,085.93 |
| ███████ | 2,585.52 |
| ███████ | 490.68 |
| ███████ | 1,694.09 |
| ███████ | 2,225.97 |
| ███████ | 404.00 |
| ███████ | 1,342.73 |
| ███████ | 180.31 |
| ███████ | 289.00 |
| ███████ | 3,937.96 |
| ███████ | 3,373.84 |
| ███████ | 305.35 |
| ███████ | 251.00 |
| ███████ | 201.33 |
| ███████ | 69.00 |
| ███████ | 175 |

| Post Date | GL-Acct | Post Comment | | Post Amt |
|---|---|---|---|---|
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-046-DM: Cust: ████ Feb 20 | | (874.68) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-047-DM: Cust: ████ Feb 20 | | (2,877.85) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-048-DM: Cust: ████ : Feb 20 | | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-049-DM: Cust: ████ Feb 20 | | (1,409.20) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-050-DM: Cust: ████ Feb 20 | | (609.78) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-001-DM: Cust: ████ Feb 20 | | (64.52) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-002-DM: Cust: 152451377800: Feb 20 | | (160.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-003-DM: Cust: ████ Feb 20 | | (200.14) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-004-DM: Cust: ████ Feb 20 | | (324.89) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-005-DM: Cust: ████ Feb 20 | | (380.81) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-051-DM: Cust: ████ Feb 20 | | (911.37) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-052-DM: Cust: ████ Feb 20 | | (402.32) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-053-DM: Cust: ████ Feb 20 | | (896.54) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-054-DM: Cust: ████ Feb 20 | | (641.35) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-055-DM: Cust: ████ Feb 20 | | (566.28) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-056-DM: Cust: ████ Feb 20 | | (1,033.80) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-057-DM: Cust: ████ : Feb 20 | | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-058-DM: Cust: ████ Feb 20 | | (1,326.76) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-059-DM: Cust: ████ Feb 20 | | (313.45) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-006-DM: Cust: ████ Feb 20 | | (381.41) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-007-DM: Cust: ████ Feb 20 | | (470.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-008-DM: Cust: ████ Feb 20 | | (484.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-009-DM: Cust: ████ Feb 20 | | (635.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-010-DM: Cust: ████ Feb 20 | | (757.57) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-011-DM: Cust: ████ Feb 20 | | (860.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-012-DM: Cust: ████ Feb 20 | | (889.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-013-DM: Cust: ████ Feb 20 | | (1,059.94) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-014-DM: Cust: ████ Feb 20 | | (1,066.93) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-015-DM: Cust: ████ Feb 20 | | (1,160.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-016-DM: Cust: ████ Feb 20 | | (1,204.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-017-DM: Cust: ████ Feb 20 | | (1,305.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-018-DM: Cust: ████ Feb 20 | | (1,570.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-019-DM: Cust: ████ Feb 20 | | (1,653.46) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-020-DM: Cust: ████ Feb 20 | | (1,669.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-021-DM: Cust: ████ Feb 20 | | (1,980.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-022-DM: Cust: ████ Feb 20 | | (2,567.30) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-023-DM: Cust: ████ Feb 20 | | (2,587.63) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-024-DM: Cust: ████ Feb 20 | | (3,078.98) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-025-DM: Cust: ████ Feb 20 | | (3,698.91) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-026-DM: Cust: ████ Feb 20 | | (386.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-027-DM: Cust: ████ : Feb 20 | | (105.88) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-028-DM: Cust: ████ Feb 20 | | (443.35) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-029-DM: Cust: ████ : Feb 20 | | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-030-DM: Cust: ████ Feb 20 | | (262.93) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-031-DM: Cust: ████ : Feb 20 | | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-032-DM: Cust: ████ Feb 20 | | (596.40) |

| | | | | |
|---|---|---|---|---|
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-033-DM: Cust: ██████████ : Feb 20 | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-034-DM: Cust: ██████████ Feb 20 | (1,055.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-035-DM: Cust: ██████████ : Feb 20 | (156.86) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-036-DM: Cust: ██████████ Feb 20 | (172.65) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-037-DM: Cust: ██████████ : Feb 20 | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-038-DM: Cust: ██████████ Feb 20 | (1,094.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-039-DM: Cust: ██████████ : Feb 20 | (148.37) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-040-DM: Cust: ██████████ Feb 20 | (512.22) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-041-DM: Cust: ██████████ Feb 20 | (928.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-042-DM: Cust: ██████████ : Feb 20 | (77.32) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-043-DM: Cust: ██████████ : Feb 20 | (10.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-044-DM: Cust: ██████████ Feb 20 | (366.68) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-045-DM: Cust: ██████████ Feb 20 | (94.72) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-060-DM: Cust: ██████████ Feb 20 | (38.74) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-061-DM: Cust: ██████████ Feb 20 | (248.52) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-062-DM: Cust: ██████████ Feb 20 | (369.82) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-063-DM: Cust ██████████ Feb 20 | (465.58) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-064-DM: Cust: ██████████ Feb 20 | (123.81) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-065-DM: Cust: ██████████ Feb 20 | (1,025.55) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-066-DM: Cust: ██████████ Feb 20 | (60.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-067-DM: Cust: ██████████ Feb 20 | (2,472.59) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-068-DM: Cust: ██████████ Feb 20 | (4,901.34) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-069-DM: Cust: ██████████ Feb 20 | (1,412.54) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-070-DM: Cust: ██████████ Feb 20 | (17.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-071-DM: Cust: ██████████ Feb 20 | (264.24) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-072-DM: Cust: ██████████ Feb 20 | (65.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-073-DM: Cust: ██████████ Feb 20 | (1,363.31) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-074-DM: Cust: ██████████ Feb 20 | (3,195.97) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-075-DM: Cust: ██████████ Feb 20 | (401.21) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-076-DM: Cust: ██████████ Feb 20 | (15.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-077-DM: Cust: ██████████ Feb 20 | (424.80) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-078-DM: Cust: ██████████ Feb 20 | (2,125.21) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-079-DM: Cust: ██████████ Feb 20 | (1,337.66) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-080-DM: Cust: ██████████ Feb 20 | (1,407.83) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-081-DM: Cust: ██████████ Feb 20 | (189.82) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-082-DM: Cust: ██████████ Feb 20 | (328.94) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-083-DM: Cust: ██████████ Feb 20 | (502.98) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-084-DM: Cust: ██████████ Feb 20 | (15.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-085-DM: Cust: ██████████ Feb 20 | (479.13) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-086-DM: Cust: ██████████ Feb 20 | (15.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-087-DM: Cust: ██████████ Feb 20 | (84.83) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-088-DM: Cust: ██████████ Feb 20 | (281.14) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-089-DM: Cust: ██████████ Feb 20 | (587.94) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-090-DM: Cust: ██████████ Feb 20 | (17.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-091-DM: Cust: ██████████ Feb 20 | (461.10) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-092-DM: Cust: ██████████ Feb 20 | (2.94) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-093-DM: Cust: ██████████ Feb 20 | (201.23) |

| | | | | | |
|---|---|---|---|---|---|
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-094-DM: Cust | ███████ | Feb 20 | (265.98) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-095-DM: Cust: | ███████ | Feb 20 | (170.93) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-096-CM: Cust: | ███████ | Feb 20 | 1,128.00 |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-097-DM: Cust | ███████ | Feb 20 | (518.19) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-098-DM: Cust: | ███████ | Feb 20 | (42.59) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-100-DM: Cust: | ███████ | Feb 20 | (886.13) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-101-DM: Cust: | ███████ | Feb 20 | (20.34) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-103-DM: Cust: | ███████ | Feb 20 | (129.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-104-DM: Cust: | ███████ | Feb 20 | (1,669.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-105-DM: Cust: | ███████ | Feb 20 | (2,120.35) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-099-DM: Cust: | ███████ | Feb 20 | (70.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-102-DM: Cust: | ███████ | Feb 20 | (129.00) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-279-DM: Cust: | ███████ | Feb 20 | (1,136.99) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-280-DM: Cust: | ███████ | Feb 20 | (69.10) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-281-DM: Cust: | ███████ | Feb 20 | (57.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-282-DM: Cust: | ███████ | Feb 20 | (97.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-283-DM: Cust: | ███████ | Feb 20 | (126.23) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-284-DM: Cust: | ███████ | Feb 20 | (19.24) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-285-DM: Cust: | ███████ | Feb 20 | (17.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-106-DM: Cust: | ███████ | Feb 20 | (17.50) |
| 2/20/2015 | 4010-0000000 | Invoice: 0215GR-107-DM: Cust: | ███████ | Feb 20 | (185.00) |